Wikkiams, J.
The facts of the case, as shown by the record, and about which there is no controversy, are substantially as follows: On the 30th day of June, 1884, the *552 plantiff, a corporation, owned and was operating a large manufacturing plant in the city of Newark, and had been the owner and operator of it for several years. The defendant, a fire insurance company, then had an established agency in Newark, in the charge of H. D. Murphy, who was also the agent of a number of other fire companies, among them The Norwich Union Company. He was a regularly commissioned agent of these companies, and was provided by them with blank applications, and policies duly signed by the proper officers, to be filled up and countersigned by him as agent, and delivered in the course of the business of his agency, and also with registers in which to keep a record of the business, and blanks for making reports of the same to the respective companies. He had, during the existence of his agency, issued a large number of policies of different companies represented by him, to the plaintiff, insuring its buildings, machinery, and stock, against loss or damage by fire, one of which was a policy on the stock for five thousand dollars in the Norwich Union, issued a short time prior to June 30, 1884. There was an understanding between the managing officer of the plaintiff and Murphy, that the latter should keep the insurance of the plaintiff up to a certain amount, either by renewals, or new polices in good companies represented by him, and his course of dealing with the plaintiff under that understanding was to charge up the amount of the premiums to the plaintiff when policies were issued, or renewed, and have periodical settlements, usually once a month, when the premiums would be paid. The Norwich Union not desiring to carry so large an insurance on the plaintiff’s stock, a few days prior to the 30th of June, 1884, directed Murphy to reduce its risk to twenty-five hundred dollars. He, thereupon, on the 30th day of June, 1884, filled up for that amount, one of the blank policies which that company had furnished him, duly signed by its proper officers, and countersigned it as agent, and at the same time filled up, for the same amount, one of the blank forms of policy with which the defendant company had supplied him, duly signed by its officers, and countersigned the same as its • agent, ready for delivery. *553 He made the customary entries of the issuing of the policies, in the registers of the respective companies, and in that of the Norwich Union an entry also of the cancellation of the five thousand dollar policy, in place of which, the two policies he had so filled up, were intended to be substituted. On the 2nd day of July, 1884, he forwarded to the defendant, at its home office, in Covington, Kentucky, what is called a daily report, in which he gave the number of the policy he had written for the plaintiff, its date, amount, and duration, the rate and amount of the premium, a description of the property insured, and other particulars of the risk. This report was received at the home office July 3, 1884. The premium on the five thousand dollar policy had been fully paid by the plaintiff, and when the entry of its cancellation was made the policy had run but a short time. The unearned or return premium was carried to the credit of the plaintiff on the books of the agent, and the amount of the premiums due on the two new policies was charged to the plaintiff, by the agent, in accordance with his previous custom. At the next regular settlement between the plaintiff and the agent, which was made July 7, 1884, there was due him from the plaintiff, on account of premiums on various policies, the sum of $438.55, which amount included the balance due on the policy of the defendant. The amount due on the account was then paid by the plaintiff. When the policy of the defendant was written, and the cancellation entered of the Norwich Union policy, the latter was in the possession of F. S. Wright, cashier of the First National Bank of Newark, as collateral. Wright was also vice president of the plaintiff, and looked after its insurance. On the 30th day of June, 1884, after writing- and executing the two new policies, and entering the cancellation of the one for which they were intended to be substituted, the agent called at the bank to see Mr. Wright, take up the policy so held by him, and deliver the new ones in its place. Wright was absent, and the agent failed to see him. He called, several times within the next day or two with like results, and did not see Wright until the evening of July 3, 1884, after the bank *554 had closed. The agent then informed Wright that, at the request of The Norwich Union Company he had canceled its policy for five thousand dollars which Wright then held, and issued to the plaintiff in its place, two other policies for twenty-five hundred dollars each, which he proposed to deliver, and take up the canceled policy. Wright replied, that was all right, all he wanted was to have it so that the amount was the same, and he (the agent) could call at the bank any time when it was open, and make the exchange, and if he (Wright) was not in, the person in charge would make the exchange for him. There appears to have been no reason why the exchange was not made at the time of the interview on the evening of July 3, except that the bank was then closed. No claim was thereafter made by the plaintiff to the canceled policy; nor was there any question at the trial, of Wright’s authority to act for the plaintiff, or of that of the agent, Murphy, to act for the defendant. The property was totally destroyed by fire on the 5th day of July, 1884. At that time the new policies had not been actually delivered, or the old one taken up. Immediately after the fire, the defendant was notified of it by telegram from the agent, who received from the defendant the following response: “Yours received. Have telegraphed. you for list of companies on stock with us. The list sent to Cincinnati made no mention of Kenton, and we were willing to be ignored. George C. Coker, Secretary.” It was admitted on the trial, that proof of the loss was duly made and filed with the defendant, that Wright then had no interest in the claim, and, if the plaintiff was entitled to recover, the amount of the recovery should be twenty-five hundred dollars with interest from September 30, 1884.
It does not appear that the names of the companies in which the new policies had been written, were mentioned in the interview between Wright and the defendant’s agent, nor the rate or amount of the premium, nor the duration or conditions of the policies; and it is claimed by the defendant, that there was, therefore, no mutual assent of the parties to either of those terms, and so, no completed con *555 tract of insurance between them. It is undoubtedly true that those are essential elements of a contract of insurance, and if there was not a meeting of the minds of the parties upon them, the contract was not consummated, and no risk attached. But it is equally true that the agreement need not be expressed in words; it may be implied from the circumstances, and conduct of the parties.
If the case of Cockerill v. Insurance Company, 16 Ohio, 148, in which it was held that a policy of insurance, to be valid, must be in writing, was not virtually overruled by the case of Insurance Company v. Kelly, 24 Ohio St., 345, as it was said to have been by Okey J., in the case of Insurance Co. v. Wall, 31 Ohio St., 633, it has been so qualified by these subsequent cases as to limit the rule it announced to policies in their strict technical sense, and leave unaffected by it, parol contracts of insurance.
It is now well settled, that a policy is only evidence of the contract, and the latter may be shown by parol, when the policy has not been written, or is withheld, unless such contract is forbidden by statute, or a provision of the company’s charter which is brought to the notice of the other contracting party. Ostander on Insurance, sections 13, 14; Richards on Insurance, section 140; Insurance Company v. Shaw, 94 U. S., 574; Insurance Company v. Kelly, supra; Palm v. Insurance Company, 20 Ohio, 529, 537. And, as in other cases of parol contracts, the terms of the agreement, and the assent of the parties to them, may be shown by their acts, and the attending circumstances, as well as the words they have, employed. There was, in this case, no express agreement in regard to the property to be insured by the new policies. The property was not mentioned in the interview between the defendant’s agent and Wright. But, as it was agreed the new policies were to be exchanged for the canceled policy, it must have been as clearly understood as if it had been expressly stated, that they were to cover the property included in the canceled policjr. So, in regard to the rate and amount of the premium, and form and conditions of the policy. It is not claimed that the conditions of the defendant’s policies, or its rate of insur *556 anee, are different from those of like companies; and, it is generally known that the form and conditions of fire policies in use by good companies do not differ substantially, and the rates of insurance are established, and uniform on the same classes of property. And where nothing is said, in the negotiation for insurance, about special rates or conditions, it may be presumed that those which were usual and customary, were intended. In Richards on Insurance, section 42 (second edition), it is laid down, as a general rule, that “whether the contract of insurance is closed by parol or by a preliminary binding receipt, the legal presumption is that the usual policy is to follow.” And in the preceding section, the same author says", that it is not necessary that all the particulars of a contract should be made the subject of express stipulation, “for it may well be understood in the absence of express declaration to the contrary that the usual form of policy is acceptable to both parties.” It was held by the Supreme Court of Minnesota, in Salisbury v. Insurance Company, 32 Minn., 460, that, “Upon an oral contract of insurance, where nothing is said about conditions, if a policy is to be issued, the parties are presumed to intend that it shall contain the conditions usually inserted in policies of insurance in like cases.” And in Eames v. Insurance Company, 94 U. S., 629, Mr. Justice Bradley, says: “It is sufficient if one party proposes to be insured, and the other party agrees to insure, and the subject, the period, the amount, and the rate of insurance is ascertained or understood, and the premium paid if demanded. It will be presumed that they contemplate such form of policj', containing such conditions and limitations as are usual in such cases, or have been used before between the parties. This is the sense and reason of the thing, and any contraiy requirement should be expressly notified to the party to be affected by it.”
Upon the facts of the present case, there can be but little doubt that the contract of insurance made by the defendant through its agent, with the plaintiff, was complete in all its terms. The plaintiff had previously arranged with the agent to keep its insurance up to a certain amount, in good *557 companies for which he was authorized to act. This arrangement virtually left the selection of the companies to the discretion of the agent; and, acting under it, he had written the policy of the defendant and the new policy of The Norwich Union Company, each for twenty-five hundred •dollars, and duly countersigned both ready for delivery to the plaintiff, and entered the cancellation of the policy which Wright had in his possession, before the interview of July 3. The policy of the defendant was then complete, containing a description of the property, the amount, commencement, and duration of the risk, the rate and amount of the premium, and all terms and conditions usual in such policies. This policy, and the new policy of the Norwich Union, the agent proposed to Wright to exchange for the canceled policy, without condition or qualification. The proposition was immediately assented to, and accepted, without any qualification or condition whatever. The terms of the contract of insurance thus proposed by the defendant, through its agent, were definite and certain in every particular; they were those set forth in the policy. The acceptance was as broad as the proposition, and was therefore an acceptance of all the terms and conditions of the policy as it was written. That the plaintiff chose to accept the proposition, unqualifiedly, without further inquiry or examination, affords the defendant no ground for claiming the contract was, on that account, incomplete. The only reason the exchange was not then made was, that the canceled policy was locked up in the bank. The parties evidently regarded the exchange as complete; and thereafter the agent was a mere custodian of the policy in question, for the plaintiff, and the actual handing of it over was not essential to the risk. Effect will be given to the intention of the parties; and what their conduct shows they considered a delivery, must control, in determining whether it was made. Biddle on Insurance, section 149; Dibble v. Northern Assurance Company, 70 Mich., 1; Bodine v. Insurance Company, 51 N. Y., 117; 11 Am. & Eng. Ency, of Raw, p. 285. It is quite evident the agent .considered the policy of the defendant in full force. He reported it as such to the company; and *558 that the latter so treated it, even after the fire, is shown by its telegram to the agent, inquiring what companies were “ on stock with us.” The policy was on the stock of the plaintiff in its manufactory. The manual surrender by Wright, of the policy in his possession, was not, we think, necessary to effect its cancellation. His assent to the cancellation made by the agent was sufficient. It then ceased to be of any force, and was so treated by the parties.
The only other ground upon which it is claimed the defendant is not liable is, that the premium was not paid until after the loss occurred. Murphy was the duly commissioned agent of the defendant, authorized to make contracts of insurance, collect premiums, and issue and renew policies; and, to that end, was furnished by the defendant with printed forms of policies, signed in blank by the president and secretary of the company, to enable him, without conference with them, to countersign and issue the policies- in behalf of the company. It is well settled that such an agent is the general agent of the company, and may, in his dealings with those he insures, waive payment in cash, of the premiums, and, indeed, any of the conditions of the policy, except when a restriction upon his authority is in some way brought to the knowledge of the insured. In a recent and valuable work on insurance, it is said, that a fire policy “does not ordinarily make the payment of the premium a condition precedent to the validity of the contract, and a general agent may of course extend credit to the insured, or not, as he chooses. The general custom where credit is given, is for the agent to do so on his own responsibility. But in case the agent should make default in accounting to the company the policy will nevertheless, be valid. And though the policy provide that it shall not take effect until the premium is paid in cash, the general agent'has power to waive the premium, and w’ill be held to have waived it if he delivers the policy without enforcing-payment.” Richards on Insurance, section 95 (second ed.). And in section 98, of the same work, that author says: “ An agent of a life company who is intrusted with the business of closing the contract by delivering the policy is held *559 'to have an implied authority to determine how the premium then due shall be paid, whether by cash, or, as is sometimes done, by giving credit, in which case the agent becomes the creditor of the insured, and the debtor of insurer. In that event, though the agent subsequently defaulted atid the money never reached the company, the policy would ■still be binding, By the weight of authority the agent is 'held to have this discretionary power, although the policy in terms denies it; but this is based upon his possession of the document for purposes of delivery, and his instructions to deliver it, and consequently his power does not extent to ■subsequent premiums or premium notes.” Bodine v. Insurance Co., 51 N. Y., 117. The authorities on this subject •are extensively collected in that very convenient, and .almost indispensable work, The American and English Enclyclopsedia of Raw, vol. 11, page 333. The waiver of the payment of the premium in cash, is an act within the ■exercise of the agent’s general authority to issue policies ■and collect the premiums, and such waiver may be either •express or implied. And when, as in the case before us, it has been the custom of the agent, under an arrangement with the insured by which the latter’s insurance should be kept up to a certain amount by renewals or new policies, to charge the insured with the premiums, as policies were issued or renewed, and have periodical ■ settlements, when the premiums would be paid, a credit for a premium so •charged, to the next period of settlement may be fairly implied.
We see no reason, upon the facts of this case, why the. ■plaintiff should not recover, as it did in the court of common pleas.

The fidgment of the circuit court is therefore reversed, and .that of the common pleas affirmed.