## EAMES *v.* HOME INSURANCE COMPANY.

1. The correspondence in this case considered, and held to create a valid contract for a policy of insurance in the Home Insurance Company of New York for $4,000 on the mill and machinery of the complainants, situated at Staunton, Ill., for one year from Oct. 12, 1872, at the rate of six and a half per cent premium.

2. It appearing that the property was destroyed by fire Oct. 29, 1872, whereby loss and damage accrued to the complainants to the whole amount of insurance, that due proof and notice were given, and that the premium for said insurance was tendered and refused, the complainants are entitled to a decree against the defendant for $4,000, less the amount of said premium, with interest and costs.

APPEAL from the Circuit Court of the United States for the Southern District of Illinois.

The facts are stated in the opinion of the court.

*Mr. J. C. Robinson* for the appellant.

*Mr. George O. Ide, contra.*

MR. JUSTICE BRADLEY delivered the opinion of the court.

This is a bill in equity filed in the court below by Eames and Cooley, the appellants, against the Home Insurance Company of New York, the appellees, to require said company to issue to the complainants a policy of insurance against loss or damage by fire, in pursuance of a contract for that purpose alleged to have been made with their agents in Illinois, and for such other and further relief as shall be just and equitable. The court below, upon hearing, dismissed the bill.

The contract referred to is alleged to have been made by means of certain parol communications and written correspondence, which are detailed and set forth in the record. The subject on which insurance was desired by the complainants was a flouring-mill and its machinery situated at Staunton, in Macoupin County, Ill., which was destroyed by fire in the night of 29th of October, 1872. Cooley, one of the complainants, had previously procured insurance on the same property from the defendant in February, 1870, which had run for two years, and had then been permitted to expire. The amount of insurance at that time was $3,500, and the rate five per cent

per annum. The policy was issued on the 28th of February, 1870, but ran one year from the 14th of that month, and was renewed for a second year by the payment of a second premium in 1871.

Cooley having taken Eames into partnership and sold him half of the property, the application for the insurance in question was made in their joint names. The negotiations were commenced on the twelfth day of October, 1872, at Bunker Hill, in Macoupin County, between Eames and James A. Beach, the company's local agent at that place. They had a general agent, A. C. Ducat, at Chicago; and it seems that local agents were not authorized to take extra-hazardous risks, to which class the property in question belonged, without referring to the general agent.

At the interview referred to, Eames, there being then no insurance on the mill, applied to Beach, who was agent for the Home Insurance Company of New York, and of the Hartford and Phœnix companies of Hartford, Conn., for $9,000 insurance; and an application to the Home Insurance was made out on a printed blank of the company for $4,000, at five and a half per cent. The application, numbered 105, was duly filled up with answers to the various questions, and signed by Eames, in the name of "Eames & Cooley," and dated the twelfth day of October, 1872. From an agreement as to certain facts made by the attorneys in the cause, it appears that said Beach forwarded said application by mail to Arthur C. Ducat, the general agent, in a letter, of which the following is a copy: —

"[Office of James A. Beach, notary public and insurance agent. Represents Home Insurance Company of New York, Hartford of Hartford, Phœnix of Hartford, Andes of Cincinnati.]

"BUNKER HILL, ILL., Oct. 12, 1872.
"A. C. DUCAT, Esq., *Genl. Agt.:*

"DEAR SIR, — I enclose app. for ins. which you have carried for two years, and was not renewed in Feb'y, because I asked 5½ (you were carrying it at 5 per cent). They now want to insure again. The other large mill in Staunton has lately burned, which is, I suppose, the reason. I have not learned the particulars, but some think the owners burned it.

"Yours truly,       JAS. A. BEACH."

That, on the 14th October, 1872, said Ducat received said letter of Beach and its enclosure, and wrote to said Beach in respect thereto a letter, whereof the following is a copy: —

"[Home Insurance Company of New York. General agency for States of Illinois, Indiana, Wisconsin, and Minnesota. Arthur C. Ducat, general agent.]

"CHICAGO, Oct. 14, 1872.

"JAS. A. BEACH, *Agt.*, Bunker Hill, Ill.:

"DR. SIR, — We have yours of the 12th, and application of Eames & Cooley on flour-mill at Staunton. Our present rate on this risk will not be less than 6½ per cent, which is probably more than they will pay. If they wish a Home policy at that rate let us know, and we will send you ticket.

"Truly yours,         ARTHUR C. DUCAT, *Genl. Agent.*"

Which letter was returned to said Ducat by mail by said Beach, Oct. 18, 1872, with the indorsement in the handwriting of said Beach: —

"The Phœnix will carry $3,000 at 6 per cent; will you not do the same?         Yours truly,

"JAMES A. BEACH."

Across which is indorsed, in pencil, Oct. 18, 1872, in the handwriting of said A. C. Ducat: —

"No; 6½ per cent is our rate."

On Oct. 18, 1872, said Ducat mailed to said Beach a letter, of which the following is a copy: —

"[Letter-head of Chicago general agency.]

"CHICAGO, ILLS., Oct. 18, 1872.

"JAMES A. BEACH, *Agt.*, Bunker Hill, Ill.:

"DR. SIR, — Yours received. We cannot go under 6½ per cent on Eames & Cooley flour-mill.

"Truly yours,         ARTHUR C. DUCAT, *Genl. Agent.*"

At this point Eames testifies that he received a letter from Beach, on or about the twenty-second day of October, 1872 (which was destroyed by the fire in the mill, and, therefore, could not be produced), in which Beach stated that he had received an answer from the Home Company, and that they would not take the risk for less than six and a half per cent.

He further testifies that this letter enclosed an application to the Hartford Insurance Company, partly filled up by Beach, and sent to him (Eames) to answer some of the questions, and to be signed by him; that, in a previous conversation between him and Beach, his complement of insurance not being made up by the four thousand that the Home would take, and the three thousand that Phœnix would take, Beach told him that he was agent for the Hartford, but did not know whether they would take any risk, but that he would write them, and, if they would, he would send him (Eames) an application to fill out; that, in a day or two after, the letter referred to came, enclosing the said application to the Hartford, filled up for $2,000, at the rate of six per cent; that the letter added that he (Beach) had not heard from the Hartford Company, but as he was going to write to him (Eames) in regard to the Home proposition, he enclosed the Hartford application, partly filled up, for Eames to finish and return, so that, if the Hartford Company would take the risk, he would have the application ready to send right on. In answer to this letter of Beach, Eames says he wrote his next letter, enclosing the application to the Hartford Company, and accepting the proposition of the Home Company.

It is admitted that he wrote, and that Beach received, the following letter on or about Friday, the 25th of October, 1872, enclosing the application referred to, filled up and signed; namely: —

"STAUNTON, ILL., Oct. 25, 1872.

"Mr. JAMES A. BEACH, Bunker Hill, Ill.:

"DEAR SIR, — I believe I have answered all the questions necessary, and to the best of my knowledge. 6½ per cent is pretty heavy, but I guess we will have to stand it, as I do not know where we can do better at present.

"Yours, &c.,          EAMES & COOLEY."

On Monday, the 28th of October, 1872, Beach mailed a letter to Ducat, the general agent, of which the following is a copy: —

"BUNKER HILL, Oct. 28, 1872.

"Hon. A. C. DUCAT.

"No. 105, Staunton Mill, @ 6½.

"DEAR SIR, — Please send me a ticket for $4,000, ins. on appl'n.

"Yours truly,          JAMES A. BEACH."

Oct. 29, 1872, Beach sent telegraphic message to Ducat, of which the following is a copy : —

"[Dated Bunker Hill, Ill., 29, 1872; received at Chicago, Oct. 29, 11.20 A.M.]

" To A. C. DUCAT, Home Ins. Co.:

" Do not return ticket for mill insurance: it is burned.

" JAS. A. BEACH."

Oct. 29, 1872, Ducat mailed to said Beach a letter, of which the following is a copy : —

" [Home Insurance Company of New York, general agency for States of Illinois, Indiana, Wisconsin, and Minnesota. Arthur C. Ducat, general agent.]

" CHICAGO, ILL., Oct. 29, 1872.

" JAS. A. BEACH, *Agt.*, Bunker Hill, Ill. :

" DEAR SIR, — Yours of the 28th, requesting ticket on the Staunton Mill, came duly this morning, and in a few minutes your telegram arrived announcing the burning of the mill. We came very near being caught, but are glad it is no worse. If we had not demanded the additional $\frac{1}{2}$ per cent we should have had $4,000 to pay.               Yours truly,

" ARTHUR C. DUCAT."

This is all the correspondence bearing upon the alleged contract , and the first question is, whether the clause in Eames's letter of Oct. 25, in these words, " Six and a half per cent is pretty heavy, but I guess we will have to stand it, as I do not know where we can do better at present," refers to the negotiation with the Home Insurance Company, and was an acceptance of their terms. Eames insists that that was what he meant by it; and if he did, on or about the 22d of October, receive a letter from Beach of the purport which he states, it would seem that there could be little doubt on the subject. Mr. Beach, in giving his testimony, was at first uncertain whether he wrote a letter or not; he had no recollection of sending such a letter ; and his final conclusion was, that he handed the application to the Hartford Company to Eames at Bunker Hill. Eames, on the contrary, testifies that he did not see Beach after being informed of the general agent's letter of Oct. 18, stating that the Home Company could not go under six and a

half per cent, until after the fire. The presumptions which apply in such cases are in favor of Eames's account. His testimony as to receiving the letter is affirmative, and his recollection of its contents circumstantial. Beach's is negative : he does not recollect writing it ; and the interview in which he supposes he gave Eames the application to the Hartford may well be confounded with the interview they had when an application to the Hartford was first talked of. And Beach evidently understood the clause referred to in Eames's letter of the 25th as referring to the Home insurance negotiation, or he would not have written to Ducat for a ticket. He explains this by saying that he understood the clause as referring to the Hartford application enclosed in the letter, but as also meaning generally that Eames was willing to give six and a half per cent, and, therefore, he sent for the ticket for the Home insurance. This is, in effect, an acknowledgment that he understood it as referring to the one as well as to the other. Taking the evidence all together, we think that Eames's statement is correct, — that he did receive the letter which he says he did on the 22d ; and that his own letter of the 25th was in answer to it. The form of language used by him, " I guess we will have to stand it," is not so ambiguous and uncertain as the appellees' counsel suppose. It is a form of expression often used in common speech, in this country, to indicate an affirmative statement. It was so understood and acted on by Mr. Beach. It is equivalent to saying, " We will take the insurance at that rate." And Ducat evidently understood the negotiation as closed, because he was on the point of sending the ticket when he received the telegram announcing the fire.

Supposing this to be the meaning of the correspondence, the next question is, whether it had the effect of creating a contract. Eames had put in an application for insurance. It was made out in the regular form. The property was fully described; the amount of insurance was named, and the rate of premium at five and a half per cent was proposed to be paid. Every thing was satisfactory to the general agent, except the rate of premium. No question was made about any thing else. The whole subsequent correspondence related to that alone. The agent required six and a half per cent instead of five and a half ;

and finally, as we construe the letter of .Eames, he (Eames) agreed to and accepted this modification. Supposing all the parties to be acting in good faith, as they were bound to act, had he not a right to suppose that the agreement was concluded, and that the risk was taken by the defendant? We do not well see how this conclusion can be avoided. He had not paid the premium, it is true ; but it is shown that this was not required until the policy was made out and delivered. It had not been required of Cooley in 1870 ; and yet the policy in that case, when issued, was made to run from the date of the application, some two weeks prior to its issue, and, of course, covered the risk during that antecedent period.

If parties could not be made secure until all the formal documents were executed and delivered, especially where the insuring company is situated in a different State, the beneficial effect of. this benign contract of insurance would often be defeated and rendered unavailable. As said by Mr. Justice Field in the case of *The Insurance Company* v. *Colt*, 20 Wall. 567, " It would be impracticable [for a company] to carry on its business in other cities and States, or at least the business would be attended with great embarrassment and inconvenience, if such preliminary arrangements required for their validity and efficacy the formalities essential to the executed contract. The law," he continues, " distinguishes between the preliminary contract to make insurance or issue a policy, and the executed contract or policy. And we are not aware that in any case, either by usage or the by-law of any company, or by any judicial decision, it has ever been held essential to the validity of these initial contracts that they should be attested by the officers and seal of the company. Any usage or decision to that effect would break up or greatly impair the business of insurance as transacted by agents of insurance companies." ·

But it is objected, in the next place, that the contract, if one was made, was not complete and precise in its terms ; that it did not state the period of time during which the risk was to continue, and did not state what kind of a policy (of two or three different kinds which the Home Company used) Eames wished to have. It does appear that the application, which was signed on the 12th of October, did not (as is usually done)

call for a statement of the period of insurance. It was one of the company's own printed blanks, and the probability is, that the reason this item was not inserted was the almost universal practice of taking ordinary insurance against fire for a year. Nothing else seems to have been in the minds of the parties. The former insurance on the property had been for that period. The bill states that Eames applied to Beach for a contract of insurance and policy on the mill for a year; and this is not denied in the answer: the application to the other companies, the Phœnix and the Hartford, seem to have been for a year. Mr. Beach, in his testimony, when asked by the counsel of defendant whether any thing had been said as to the length of time the complainants wanted insurance in the Home, promptly answered, "If I mistake not, the application states 'for one year;'" and was only convinced to the contrary after an inspection of the document. The premium is constantly spoken of by the witnesses and in the letters as so much per cent absolutely, — six and a half per cent, — without adding "per annum;" and yet we know that a year's premium was meant. It may be said that this is the usual mode of speaking when rate per annum is intended. This is undoubtedly true when an ordinary policy for a year is the subject of discussion. But when insurance for a fractional part of a year, or any unusual period, is proposed or spoken of, it is not the customary mode of speaking. It is then usual to add the words "per annum," in order to avoid mistake. We think it perfectly manifest, from all the evidence taken together, that the parties meant and intended an insurance for a year, and had nothing else in their minds. This is the inference to be drawn from all their conduct, conversations, and correspondence; and we should be sticking in the bark to ignore it.

The plea that no time for the continuance of the insurance was stipulated for is evidently a mere afterthought.

There is no difficulty as to the time when the risk was to commence. It was the practice of the defendant, as it is of most, if not all, other companies, to antedate the policy to the time of making the application; which, in this case, was on the twelfth day of October, 1872. This practice is more beneficial to the companies than to the insured. They are not liable until the con-

tract is completed, and if a loss occurs before its completion they have nothing to pay; and yet they get the benefit of the premium for this period whenever the contract is completed.

As to the plea that the contract does not specify what kind of a policy was desired, it does not appear that the complainants had any knowledge or notice that the defendant issued different kinds of policies. As Eames justly said, he supposed (as he had a right to suppose) that they would get the same kind of policy which had been issued on the property before. If no preliminary contract would be valid unless it specified minutely the terms to be contained in the policy to be issued, no such contract could ever be made or would ever be of any use. The very reason for sustaining such contracts is, that the parties may have the benefit of them during that incipient period when the papers are being perfected and transmitted. It is sufficient if one party proposes to be insured, and the other party agrees to insure, and the subject, the period, the amount, and the rate of insurance is ascertained or understood, and the premium paid if demanded. It will be presumed that they contemplate such form of policy, containing such conditions and limitations as are usual in such cases, or have been used before between the parties. This is the sense and reason of the thing, and any contrary requirement should be expressly notified to the party to be affected by it.

As to the objection that the application in this case does not truly set forth the title of the complainants and the amount and nature of the incumbrances on the property, and the amount of insurance in other companies, it is sufficient to say that the evidence abundantly shows that all the facts were fully and frankly communicated to Beach, the agent of the company, and were indeed known to him before; and that he wrote down the answers according to his view of their bearing and legal effect, Eames relying entirely on his experience in such matters. There is no reason to suppose that either Eames or Beach did not act in entire good faith in the transaction. And, indeed, it cannot be pretended that the facts were not substantially as represented in the application. The complainants are represented to be the owners of the property, which is stated to be subject to a mortgage for $6,000. The fact was, that they had

purchased the property for $12,000, and had paid $6,200 of the purchase-money, the vendor having a lien for the balance of $5,800 ; but no deed had ever been given. So that, in truth, the complainants did not hold the legal title, although they had an equitable one ; and had not given a mortgage, although the vendor's lien was equivalent to one. In another answer, however, explaining the mortgagee's interest, it is stated expressly to be a " lien on mill to secure payment of sale.". As the exact facts were communicated to the agent, and he took the responsibility of stating them in the way he did, leading the applicant to suppose that it was all right, we think it would be great injustice to turn him out of court now for this inexact method of statement. According to the views expressed by this court in *Insurance Company* v. *Wilkinson*, 13 Wall. 222, and other more recent cases, the defendant was concluded by the act of its agent. The reference to collateral insurances in other companies is subject to the same consideration. The insurances were being applied for through this very agent who wrote the answers, and who knew the whole facts, and between whom and the general agent they had been referred to in their correspondence. The defence on this ground is utterly destitute of equitable consideration.

After giving due attention to the pleadings and evidence in this case, we are forced to the conclusion that a contract for a policy of insurance was fairly made, and that a decree should have been rendered for the complainants, declaring them entitled to a policy of insurance to be issued by the defendant, in the usual form in such cases, for $4,000 on the mill and machinery of the complainants, situated at Staunton, in the county of Macoupin, Ill., to run and be in operation for one year from the twelfth day of October, 1872, at the rate of six and a half per cent premium ; and, as it appears that the said property was destroyed by fire on the twenty-ninth day of October, 1872, whereby loss and damage accrued to the complainants to the whole amount of the said insurance, and that due proof and notice of such loss was given, and that the premium for said insurance was tendered and refused, it should be further decreed that the defendant pay to the said complainants the said sum of $4,000 (less the amount of said premium), with interest and costs.

See *Taylor* v. *Merchants' Insurance Co.*, 9 How. 405; *Perkins* v. *Washington Insurance Co.*, 4 Cow. (N. Y.) 666; *Carpenter* v. *Mutual Safety Insurance Co.*, 4 Sandf. (N. Y.) Ch. 410.

*Decree reversed, and cause remanded with directions to enter a decree in conformity with this opinion, and to take such further proceedings as law and equity may require.*