[S. F. No. 8796. In Bank.—May 12, 1920.]

## WESTERN INDEMNITY COMPANY (a Corporation), Petitioner, v. INDUSTRIAL ACCIDENT COMMISSION et al., Respondents.

[1] INSURANCE — RENEWAL OF POLICY — PAYMENT OF INCREASED PREMIUM—WILLINGNESS OF INSURED—NEGLECT OF LOCAL AGENT TO ADVISE COMPANY—EFFECT OF.—Where an employer of farm labor made application to a duly accredited and authorized agent of an indemnity insurance company for the renewal of a policy covering liabilities for injuries to employees, and expressed his willingness to pay whatever increased premium the company might require, and the agent prepared, signed, and forwarded a written application for the insurance to the general agent without communicating the willingness of the applicant to pay any increased premium, and the general agent upon receipt of such application immediately notified the local agent of an increase in premium, and that the application would be held pending advice as to whether insurance should be written at the increased rate, there was no meeting of minds on one of the elements of the contract of insurance until the applicant accepted the counter-offer of the company.

[2] WORKMEN'S COMPENSATION ACT—FINDINGS OF COMMISSION—WHEN CONCLUSIVE.—Findings of the Industrial Accident Commission upon questions of fact are conclusive where there is any substantial evidence to support the award.

[3] ID. — AWARD OF COMPENSATION AGAINST INSURANCE CARRIER — WILLINGNESS TO PAY INCREASED PREMIUM—COMMUNICATION TO INSURANCE COMPANY PRIOR TO ACCIDENT—INSUFFICIENCY OF EVIDENCE.—In this proceeding by an indemnity insurance company to review an order of the Industrial Accident Commission awarding compensation for the death of an employee, the evidence is held insufficient to show that the employer had accepted the counter-offer of the company as to the payment of the increased premium prior to the accident.

[4] INSURANCE—ACCEPTANCE OF TERMS OF INSURER—COMMUNICATION BY LOCAL AGENT TO INSURER UNNECESSARY.—If the applicant accepts the terms granted by the company the contract is considered complete, without waiting for the local agent to communicate the acceptance to the company.

[5] ID.—PAROL CONTRACT OF INSURANCE—AUTHORITY OF LOCAL AGENT —INSUFFICIENCY OF EVIDENCE.—In this proceeding the evidence is held insufficient to show that the local agent had authority to bind the company by a parol contract of insurance.

[6] ID.—COVERAGE FROM DATE OF APPLICATION—CUSTOM—FINDING UNSUPPORTED BY EVIDENCE.—In this proceeding the finding of the commission that it was the custom and the practice that an assured was covered by insurance, subsequently provided in the policy, from the date of his application, is held not supported by the evidence.

[7] ID.—ISSUANCE OF POLICY FOR KNOWN LOSS—AUTHORITY OF GENERAL AGENT.—The general rule is that whenever the parties have entered into a contract before the loss occurs or the policy has been issued, unless the authority of the general agent is expressly delimited, the policy, when issued, by operation of law relates back to the application and is dated accordingly—the policy being thereafter merely evidence of the contract; but this general rule has no application where the parties were not under contract at the time of the injury, and the general agent is without special authority to issue a policy to cover the loss.

PROCEEDINGS on Certiorari to review an order of the Industrial Accident Commission awarding compensation. Award annulled.

The facts are stated in the opinion of the court.

Eugene F. Conlin for Petitioner.

Christopher M. Bradley, A. E. Graupner and Clarence N. Riggins for Respondents.

LAWLOR, J.—This is a writ of review issued upon the application of petitioner, the Western Indemnity Company, a corporation. The Industrial Accident Commission, on April 23, 1918, made an award in the sum of $2,596.14 against the petitioner and in favor of Ethel Lamb, for the accidental death of her husband, John Lamb, an employee of Dr. Pond, of Napa County, it having been found by the commission that petitioner was the insurance carrier of Dr. Pond at the time of the injury. It appears that Dr. Pond had been engaged in operating a small farm and fruit orchard some ten or twelve miles from the city of Napa. John Lamb was employed on the place as a man of all work, and, although that kind of occupation does not fall within the Workmen's Compensation Act, both Dr. Pond and Lamb nevertheless elected to come under its provisions.

On October 2, 1917, Lamb took a team of horses used on the place to a blacksmith-shop in the city of Napa to be shod. About noon, as he was taking the horses out of the shop, they became unmanageable and trampled upon him, inflicting injuries from which he died on October 6th.

The principal contention of petitioner is that it was not the insurance carrier of Dr. Pond when the accident occurred, and in this connection petitioner makes the claim that the following findings of the commission are without support in the evidence:

"6. That prior to the said second day of October, 1917, and on or about the twenty-fourth day of September, 1917, the defendant M. B. Pond had applied to Arthur H. Smith of Napa, the duly accredited and authorized agent of the defendant Western Indemnity Company, for a renewal of a then expiring policy of insurance covering his liability for injury to his employees, and had requested said agent to procure for him such policy, to take effect upon the expiration of his then existing policy, which would expire on September 25, 1917. That at that time it was the custom and the practice that an assured was covered by the insurance subsequently provided in the policy, from the date of his application. That after the application by said defendant Pond, and before the said second day of October, 1917, said defendant Pond was notified by said agent Smith that the premium or rate of said insurance had increased, the exact amount of such increase being at that time not known to said agent. That thereupon said defendant Pond stated his willingness and consent to pay the increased rate and again requested that the policy be issued. That thereafter, and on or about the tenth day of October, 1917, the general agents of said Western Indemnity Company duly issued their policy of insurance dated the twenty-fifth day of September, 1917, to the said defendant Pond, insuring him against his liability for injuries to his employees, and that on the tenth day of October, 1917, said defendant duly paid to said agent Smith the full premium for said insurance, which premium was duly received and accepted by said agent. 7. That by reason of the facts as set forth in paragraph 6 hereof, the defendant Western Indemnity Company was the insurance carrier of said defendant employer at the time of said injury and had insured said employer

against liability for full compensation for said injury, and said employer is entitled to be relieved from such liability under the provisions of subdivision (e) (2) of section 30 of the Workmen's Compensation, Insurance and Safety Act of 1917." The evidence will sufficiently appear in the discussion.

Arthur H. Smith, doing business under the name of "Arthur H. Smith & Co.," in the city of Napa, was engaged in placing insurance for various companies, including the Western Indemnity Company. Upon the filing by petitioner with the state insurance commissioner of "a duplicate power of attorney" on July 1, 1917, a license was issued to Smith for the term of one year in compliance with the provisions of section 633 of the Political Code. The license gave Smith authority "to solicit applications for insurance or surety bonds or to effect insurance or surety bonds in the name of said company." This power of attorney was not introduced in evidence, but we shall assume that it corresponded with the license.

In September, 1916, Smith secured for Dr. Pond a policy of compensation insurance in "The Massachusetts Company." That policy expired on September 25, 1917. On September 24, 1917, Dr. Pond went to the office of Smith and "verbally" requested that such policy be "renewed." There is a dispute in the testimony of Dr. Pond and Smith as to whether on this occasion Dr. Pond saw Smith personally or dealt with an employee in Smith's office. Dr. Pond testified that "some time in September, I think after the 15th, I received a letter from Mr. Smith stating that my policy terminated . . . asking me . . . if I wanted a renewal. I gave the letter to Mr. Smith when I went and ordered a renewal of insurance. I left it as a reminder. . . . He says: 'The premium will be raised.' I was informed that the last premium would be $10 for farmers, and it would be probably $15. . . . Any discussion we had was simply his statement to me that it would be probably not less than $15, and I told him to go ahead. I wanted to be insured even if it was more. He told me right on the start it would probably be that much, 'possibly more,' is the way he put it." Smith was asked: "At the time you took that application from Dr. Pond, was there any question about the issuance of a policy on account of the pre-

mium—minimum premium?" And he answered: "You will have to ask the young lady in the office. She did that work that day. I was not in . . . " Smith also testified that the general agent had informed him in a letter of June 29, 1917, that the premium rate for compensation insurance would 'be $10 "at least temporarily," and that "the first notice I had that the minimum premium on farm labor · policies had been raised by petitioner was when this application was referred to in this case as being $15."

Smith stated further that, as "The Massachusetts Company" had discontinued writing compensation insurance, on September 24th he forwarded to the general agent a written application for coverage for Dr. Pond to begin on September 25, 1917, the application being signed by Smith alone, and in item 14 thereof, opposite the printed words "the minimum premium for this policy," appearing the figures "$10.00." This application was received on September 25th in the office of the general agent, Arthur G. Nason, who conducted the agency as "Arthur G. Nason & Co." In due course Smith received an answer to the application under date of September 26th to the effect that the minimum premium on farm labor policies was $15, and stating: "We shall hold the application pending receipt of your advices as to whether or not we may write at this rate." On September 29th Smith wrote to Dr. Pond: "We are in receipt of a letter from the company stating that the least they can write a compensation policy on farm labor is $15 minimum premium. Kindly advise us by return mail if this is satisfactory to you."

There is a further lack of agreement in the testimony of Dr. Pond and Smith as to what occurred after September 24th. Smith testified as follows: "Q. Did you not see him between September 24th and October 2d? A. Me? No. . . . Q. Do you know whether he came to your office during that interval? A. I couldn't say. Q. Was it reported to you that he had been in there? A. No. I don't recall it if it was. . . . Q. Then he didn't answer your letter of September ·29th until after the accident on October 2d? A. That is right. . . . Q. Did you see him on the afternoon of October 2d? A. I did. . . . In my office. . . . He said it would be all right at the $15 premium. . . . Q. When

Dr. Pond did call on you on October 2d did you then know that this accident had occurred? A. I did.'' Dr. Pond's testimony is less definite as to when, after September 24th, he talked with Smith about the matter: ''Q. And did you return afterwards to Mr. Smith's office for your insurance policy, . . . and on what date? A. I can't say as to the first time—the date—but I went and had a talk with Mr. Smith and he said it was all right. . . . Q. When did you go back to Mr. Smith after requesting that he have the policy renewed? Was it before or after October 2d? A. Well, my memory is this: that I had another talk with Mr. Smith after ordering a renewal, when he told me that it would be at least $15. 'Well, it might be more,' he said. 'Well,' I said, 'I will draw you a check for $15, it doesn't make any difference. If it is more, I will give you more, and if it is less you can refund it.' He said, 'It would not be less.' On October 2d I called again on Mr. Smith and again tendered money which he refused because he did not know exactly what it would be. He had written me a letter and I think it was dated the 29th of September, that it would be $15. Whether I called between the twenty-ninth and the second day of October, the date of the accident, I don't remember positively. Q. But on October 2d, was it after the accident that you called at Mr. Smith's office? A. It was. . . . Q. When did you receive that letter, doctor? A. I can't tell you exactly. I don't know. Q. But after you received that letter, you called on Mr. Smith, did you not? A. Yes, sir. Q. And that was after the accident had occurred? A. I think I called on Mr. Smith before. I am not positive. I called immediately on receiving the letter. . . . Q. Did you get it before or after the accident? A. I am not positive. I went immediately when I did receive it to Mr. Smith, but I can't say positively whether it was before the accident or after. Q. Then, immediately upon receiving the letter—you received it before the accident—you went to Mr. Smith? A. Yes, sir. My impression is that I did. Q. Did what? A. That I did go to Mr. Smith before the accident to tell him it was all right, verbally. My impression is that, but I wouldn't say positively. . . . Q. You are not sure before the accident or after? A. I am not sure. . . . I think so, but I am not positive. Q. You have testified very clearly

that you went to Mr. Smith's office after the accident on October 2d? A. Yes. Q. But it is not clear in your mind whether you had the conversation at that time with Mr. Smith about the minimum premium of $15 or not? A. No, I am not, but mind you, before that Mr. Smith had told me that would probably be $15 and probably more—before that time."

On the afternoon of October 2d, after Dr. Pond had called on Smith and they were both aware of the injury to Lamb, Smith wrote the following letter to the general agent: "In answer to your favor of the 26th of September in regard to application of Milo B. Pond, would ask that you kindly issue policy at the $15 minimum." No mention of the accident was made in this letter. On October 3d Smith wrote again to the general agent: "We herewith enclose you report of accident to John Lamb, employed by Dr. M. B. Pond. Kindly give this your attention." Before the receipt of this letter, and in response to that of October 2d, the office of the general agent issued a policy at the $15 rate and dated it October 3d. This was received by Smith on October 4th. On October 5th he sent the following letter to the general agent: "We herewith return you policy No. CC–14425, Milo B. Pond, as you have made an error in dating same. Under date of September 24, 1917, we sent you application asking you to issue the policy, and under date of September 26th you wrote us advising us of the increase in the minimum charge and also stating that you would hold the application pending receipt of our advices. Kindly issue this policy from date of application." No written reply was made to this letter, but Smith testified that the date of the policy was changed from October 3d to September 25th, while he was in the office of the general agent on October 8th or 9th. From the testimony that follows it would appear that the actual date of this meeting and the alteration of the policy was October 9th. A report of the results of the post-mortem examination was forwarded from Smith's office to the general agent on the last-mentioned date. On October 10th Dr. Pond paid the $15 premium to Smith, who issued a receipt therefor and delivered the policy to him.

Charles M. Wilson, manager of Nason's office, and head of the indemnity insurance department thereof, testified

that Smith himself called at the office in San Francisco about October 9th, and claimed that Dr. Pond's policy had been incorrectly dated; that on this last-mentioned occasion the witness examined the records of the office and found that Russell B. Adams, an "underwriter and clerk" in the office, had changed the date of the original application to October 3d; that, "as a matter of custom," he, without consulting the general agent or any of his staff, then changed the date of the policy to conform to the time of the receipt of the application—September 25th—and delivered the policy with the altered date to Smith. Wilson then knew that "Dr. Pond had an accident to one of his employees."

Nason himself testified that he did not learn of the accident until "after October 3d. . . . The first that came to my attention was that I was informed that the claim adjuster was called upon by Mr. Wilson to go to Napa to attend the coroner's inquest. . . . That was the first that I knew. . . . Q. As a matter of fact, you are not familiar with the details of your office? A. Absolutely not. Q. You left it to your manager, did you not? A. Yes; unless some trouble arose over a matter I wouldn't interfere at all."

The following testimony was given by Russell B. Adams: "Q. State whether or not on behalf of Arthur G. Nason & Company you accepted said application . . . from . . . Dr. Milo B. Pond. A. The application was not accepted. Q. Please state what action you took upon the said application. . . . A. On receipt of the application I noted the premium specified was not up to our charge. A letter was written by me to Smith advising of this and saying the application would be held pending his advices. Q. In acknowledging the said letter from . . . Smith . . . state whether or not it was your intention as representative of . . . Nason . . . to hold . . . Dr. Pond covered under a policy. A. It was not my intention to cover the risk. Q. Please state what your intentions were as to the said application. A. To hold it until advised by our agent as to whether the insurance was desired at the higher rate. Q. Was it at any time subsequently to the receipt of the application your intention to bind or consider said application of any force or effect, or as constituting any insurance covering Dr. Pond? A. No. . . . No instructions were

ever given me to bind this risk or to write a policy. Q. In issuing a binder for such policy . . . what has been your custom while employed by Nason? A. A record of risks bound was kept by Nason. The name, date covered, and nature of covering was always kept. Q. Please state fully what course you would have taken had you intended . . . to hold Dr. Pond covered under a policy. . . . A. A binder would have been issued and recorded as above; in any case there would have been a record of any covering granted.''

The respondents in their reply to petitioner's supplemental brief take a different position with regard to the evidence as to when Dr. Pond expressed his willingness to accept the $15 rate from that stated in their first brief. It is insisted in their last position that ''at the time of the application for a renewal Dr. Pond was told by Mr. Smith that the premium would be raised and that it would be probably $15 as a minimum. Dr. Pond thereupon informed Mr. Smith that the amount of the premium was immaterial —that he wanted a policy. . . Respondents contend that this made a complete meeting of minds on the only issue— the premium.''

From this it is argued that *the letter of September 29th* *''was superfluous and should not in any way be considered* in this cause, for the reason that Smith had already been told by Dr. Pond that he wanted the policy regardless of the amount of the premium.'' (Italics ours.) In their first brief respondents state that, ''On September 24, 1917, Pond applied to Smith at Napa for a policy. . . . *There may or* *may not have been some discussion between Smith and* *Pond . . . concerning the premium . . . at the time the ap-* *plication was made. It is immaterial.* . . . The offer of Dr. Pond when it reached the office of the general agent . . . was refused. . . . The petitioner made a new offer to extend coverage to Dr. Pond . . . at an increased price. . . . This offer of petitioner is contained in the letter to Smith . . . under date of September 26th . . . and in the letter from Smith to Dr. Pond under date of September 29th. The offer thus made by petitioner was never at any time withdrawn. Indisputably it was accepted by Dr. Pond. . . . *What happened in the interim is of no consequence.''* (Italics ours.)

We do not agree with respondents, as will appear from our discussion, that the letter of September 29th was "superfluous" or that "it is immaterial" what discussion was had on September 24th. One reason for setting forth at length the variant positions of respondents is that our interpretation of the findings on this point may appear more clearly. The use of the relative terms "before" and "after" in the sentence relating to the notification to Dr. Pond of the increased rate precludes the idea that the commission meant to find that there was a meeting of minds on September 24th. As already shown, Smith's testimony was that he personally had only one interview with Dr. Pond about the rate—after the accident on October 2d. We shall assume, for the purposes of this discussion, that the commission found that Smith did discuss the rate with Dr. Pond on September 24th. Dr. Pond is less definite as to the number of times he canvassed the premium rate with Smith, but we think his testimony indicates that he meant to convey the impression that he saw Smith three times: (1) on September 24th, (2) on a later date before Smith had received the letter of September 26th, and (3) after Dr. Pond had received the letter of September 29th—but as to this he would not say definitely whether it was before or after the accident. Indeed, Dr. Pond did not testify definitely to any date except October 2d, when he called at Smith's office after Lamb was injured. There is further disagreement in the testimony in that Smith stated that he did not know of the increased rate until he received the letter of September 26th, while Dr. Pond claims that the higher premium was discussed when he ordered the "renewal."

We have said that the finding cannot be interpreted to mean that the contract was concluded on September 24th, nor do we think it can be ascertained therefrom when, according to the commission, Dr. Pond consented to the rate. And, unless the conjunctive "thereupon" connotates an interval between the notification and the consent, it cannot be determined whether the commission found that the rate was agreed upon before or after the injury. Do the findings refer to the second occasion mentioned in Dr. Pond's testimony? The plausible theory is that they do. The word "thereupon" could properly have reference only to an occasion where there was at once a proposal and an

acceptance. The term would not describe either of the other occasions. Considered in connection with the statement that he "again" requested that the policy be issued, "thereupon" indicates that he accepted the rate immediately, and "again" connects up with the original request for a "renewal." And, as further supporting this theory, is the circumstance that, according to the same finding, Smith did not then know what the amount of the premium would be. We think it clear that the finding does not refer either to the first or to the third occasion mentioned in the testimony of Dr. Pond. The word "thereupon" could not allude to the interval—however brief it may have been—between the receipt by Dr. Pond of the letter of September 29th and the interview which followed in Smith's office. Moreover, it is shown by the letter of September 29th that when Smith sent it he did know "the exact amount of such increase." It is also to be noted that in the sentence we are discussing the phrase found in the preceding sentence—"and before the 2d day of October"—is significantly missing. In our opinion it was important for the commission to find whether Dr. Pond accepted the rate on the first, the second, or the third of these occasions, for if it was upon the first or second occasion we should be obliged to declare that the findings are not supported by the evidence: Upon the receipt of the application, whatever the scope or extent of Smith's authority may have been—and we shall consider this later—the matter of the rate was taken out of his hands by the letter from the general agent of September 26th, which constituted a counter-offer. [1] So that, up to the time Dr. Pond accepted the counter-offer, there was no meeting of minds on one of the elements of the contract. This would be true even if the testimony of Dr. Pond had been accepted by the commission that he stated on the first occasion he wanted the insurance though the premium might be more than $15, or when he was in Smith's office on the second occasion, for upon the counter-offer he was called upon either to accept it or to reject it definitely. We must conclude, therefore, that the commission based its findings on the first or second occasion, or both, and not upon the period following the receipt by Dr. Pond of the letter of September 29th, although if the findings did relate to the last occasion we are not to be

understood to say that the evidence would be sufficient. We are fortified in this conclusion by the testimony of Dr. Pond himself. He admits that he went to Smith's office *after* the injury. He does not say that he called at any other time on October 2d or that he was in the office more than once after he got the letter. Nor is his testimony definite as to whether he received the letter before or after the accident. We are not losing sight of his testimony that he' reported to Smith "immediately" on receipt of the letter, that he thought he received it and saw Smith before Lamb was' hurt, that on the second occasion he offered and Smith refused his check, that his purpose in going to Smith's office on October 2d was again to tender the premium and receive the policy, and that "I did go to Mr. Smith before the accident to tell him it was all right verbally." But, in any event, in our opinion the evidence would not support a finding that Dr. Pond accepted the rate at any time prior to the afternoon of October 2d.

[2] It is well settled that the findings of the commission upon questions of fact are conclusive where there is any substantial evidence to support the award. (*Western Indemnity Co.* v. *Pillsbury et al.*, 172 Cal. 807, [159 Pac. 721]; *Massachusetts B. & I. Co.* v. *Industrial Acc. Com.*, 176 Cal. 488, [168 Pac. 1050].) [3] Upon the question of fact we have been discussing, however, taking into account all the pertinent evidence bearing on the point, the apparently consistent and convincing testimony of Smith—supported as it is by the correspondence and the sequence and import of events concerning which there is no dispute, the uncertain testimony of Dr. Pond in most particulars—especially in respect to the time when he acted upon the letter of September 29th, and the lack of clearness and definiteness in the findings on the conflict in the evidence—if it can be said that the evidence is really involved in conflict as to the time of his acceptance, we are constrained to declare that even if the findings are to be interpreted as meaning that Dr. Pond had accepted the counter-offer prior to the accident, they are, nevertheless, without support in the evidence. We are not prepared to say, however, that if Dr. Pond had, with some regard for certainty and precision, fixed his acceptance as of a time prior to the casualty we would set aside the finding. We do not think that his testimony can be said to con-

tradict that of his own witness, Smith, on the point, that it was sufficiently definite to raise a conflict, or, if there was a conflict, that the findings in any true sense resolved it.

Having reached the conclusion that a contract was not concluded prior to the injury, we shall now dispose of petitioner's objection to the finding that Smith was the agent of the company in the transaction. It is claimed in the brief of petitioner that "Smith had not been given, and did not have, and never attempted to exercise any power or authority over the policies of the company, except to receive and deliver the same, . . . and at no time did he have or claim that he had the right to fix the rate or to execute, issue, sign, countersign, or modify a policy issued by this company. . . . " Smith testified that he was the agent of petitioner and not of Dr. Pond. If this be true it might be held that if Dr. Pond had, prior to the accident, notified Smith of his acceptance of the counter-offer the contract would thereupon have been completed, notwithstanding that Smith did not communicate such acceptance to his principal before the loss occurred. [4] "If the applicant accepts the terms granted by the company the contract is considered complete, without waiting for the local agent to communicate the acceptance to the company." (1 Cooley's Briefs on Insurance, p. 425. See *Tayloe* v. *Merchants' etc. Co.*, 50 U. S. (9 How.) 390, [13 L. Ed. 187, see, also, Rose's U. S. Notes]; *Carter* v. *Bankers L. I. Co.*, 83 Neb. 810, [120 N. W. 455]; 1 Joyce on Insurance, p. 230.) But on this question it must be kept in view, as tending to show that in the mind of at least one of the parties the contract was not complete, that Smith waited until he heard from Dr. Pond concerning the counter-offer before ordering the policy, and that when he did hear from him he promptly notified the general agent.

It is to be noted, however, that the commission did not in its findings determine the character and scope of Smith's authority as agent for petitioner, and this renders it necessary next to consider whether he could bind petitioner by a parol contract of insurance. Smith testified that "binders" were used in San Francisco, but not in Napa; that he issued none in this instance, but that he had been "advised by Mr. Nason and Mr. Wilson . . . that before the policy is issued the applicant is covered . . . from the date of the applica-

tion." Smith's own position—erroneously assumed, as we shall see—was that coverage was effected from the date of the application, notwithstanding the contract was not completed before the loss. Wilson, when he was asked whether Smith was "authorized to bind the company·from the date of the application, . . . " answered, "I don't know." Nason's position was stated as follows: "Q. Is it your custom during that interim [between the original application and the final acceptance or rejection thereof] to consider the man or the assured covered? A. Not unless a binder is given." Dr. Pond testified: "Q. But on October 2d, was it after the accident you called again at Mr. Smith's office? A. It was. Q. And did Mr. Smith at that time tell you that the policy had been applied for or had been issued? A. He told me it had not only been applied for but I was perfectly secured. . . . Q. Did he tell you positively that he had made application to the insurance company for you to have a policy issued in your favor? A. Showed me a copy of the application. Read it to me to show that I was secured. . . . Q. Doctor, did Mr. Smith tell you you were wholly covered? A. Yes. Q. And you never considered that you did not have any insurance? A. I never questioned it for a moment." From this testimony it would appear that Smith did not give assurances of coverage to Dr. Pond until after the accident. This is in accord with the former's testimony, for, as already shown, he said he saw Dr. Pond only once— on the afternoon of October 2d. Smith also testified that he had not been in the habit of issuing policies for petitioner, and that the invariable custom was to send the applications to the general agency, where the policies were issued and forwarded to him for delivery. [5] We shall assume that Smith was, for certain purposes at least, petitioner's agent; but neither in the testimony we have just quoted, nor elsewhere in the record, is there a particle of evidence to indicate that he had authority to bind petitioner by parol. Hence, even if the commission had meant so to convey by its finding that Smith was "the duly accredited and authorized agent of . . . Western Indemnity Company," and if Smith had given assurances of coverage to Dr. Pond before the injury—and not afterward—as the fact seems to be, still such a finding would be without support in the evidence.

[6] We turn now to the question whether the finding "that it was the custom and the practice that an assured was covered by the insurance, subsequently provided in the policy, from the date of his application," may be sustained. We cannot determine from the record whether the commission intended to find that such "custom and practice" was followed as well when the contract of insurance was not concluded before a loss as when it was. If the former, from the conclusion we have already reached as to when the contract was completed, we must hold that the finding is not supported by the evidence. In addition to Smith's testimony that he was advised by the general agent and Wilson that an applicant was covered from the date of his application, he stated that in all the policies he had received from the company the date corresponded with that of the application, but he admitted that he had never, except in this instance, sent in an application to petitioner whose terms were not acceptable. Wilson's testimony corroborates that of Smith on the point that the policies sent to him had always borne the date of the application, so as to provide coverage from the beginning, but he does not state that such custom and practice were observed where the terms of an application were not unconditionally accepted by the company. The testimony of Nason and Adams, which we have quoted, tends to show positively that this custom and practice did not prevail in such circumstances. It seems to us that this finding is without support in the evidence.

It only remains to consider whether, where the loss has occurred before the parties had come to an understanding upon the terms of the contract, the general agent has authority to issue a policy so as to cover the uncovered loss.

The cause was argued before this court and submitted for decision. The submission was subsequently vacated and the cause set for further argument upon the questions: "(1) As to the authority of the general agent of a foreign insurance company after a loss not amounting to a total loss has occurred to the knowledge of the agent, to deliver a policy of insurance antedated so as to cover the loss, there being at the time no binding agreement for the insurance between the insured and the company, and (2) as to the authority in the particular case of Wilson, the employee of the general agent, to make such delivery on behalf of the

general agent, assuming that the general agent had himself such authority.'' After the above order of resubmission the respondent commission filed a supplemental brief in which, among other points, it is urged that ''the actions of the employees of Nason Company were the actions of Nason Company,'' and in support of the contention the following authorities are cited: *International Trust Co.* v. *Insurance Co.*, 71 Fed. 81, [17 C. C. A. 608]; *Mound City Ins. Co.* v. *Huth,* 49 Ala. 529; *Eclectic Ins. Co.* v. *Fahrenkrug,* 68 Ill. 463; *Continental Ins. Co.* v. *Ruckman,* 127 Ill. 364, [11 Am. St. Rep. 121, 20 N. E. 77]; *Mayer* v. *Mutual Life Ins. Co.*, 38 Iowa, 304, [18 Am. Rep. 34]; *Bodine* v. *Exchange Fire Ins. Co.*, 51 N. Y. 117, [10 Am. Rep. 566]. But we do not deem it necessary to discuss this point, and we shall, therefore, proceed on the assumption that the acts of Wilson and Adams stand as the acts of the general agent just as if Smith had dealt directly with him.

The policy was introduced in evidence and contained the following provisions: ''K: No assignment or change of interest and no change, waiver, or extension of any of the terms or conditions of this policy shall be valid, unless endorsed hereon and signed by an officer of the Company, nor shall notice to any agent or any other person be held to effect a waiver or change in any part of the policy. . . . M. The term of this policy shall be twelve months from October 3, 1917, beginning and ending at twelve o'clock noon, standard time, at the assured's business address stated herein.'' It is contended by petitioner that as Nason, according to his own testimony, was not an officer of the company, the alteration of the date of the policy was not binding on the petitioner, the policy did not cover liability prior to October 3d, and, therefore, petitioner was not the insurance carrier of Dr. Pond at the time of the accident. But, as the decisive question here is whether the general agent had authority to *issue* a policy covering a known loss, rather than whether he was authorized to *alter* a policy properly issued in the first place, we are not called upon to discuss the provision in clause ''K.''

The general rule covering this question is thus stated in Cooley's Briefs on Insurance, volume 1, at page 354: ''It may . . . be regarded as elementary that an agent has no authority to insure goods which he knows to have already

been destroyed by fire." And this rule finds support in the following cases: *Mead* v. *Phenix Ins. Co.*, 158 Mass. 124, [32 N. E. 945]; *Clark* v. *Insurance Co. of North America,* 89 Me. 26, [35 L. R. A. 276, 35 Atl. 1008]; *Stebbins* v. *Lancashire Ins. Co.*, 60 N. H. 65. And in *Waterloo Lumber Co.* v. *Des Moines Ins. Co.*, 158 Iowa, 563, [51 L. R. A. (N. S.) 539, 138 N. W. 504], the court said: "It has frequently been held that an agent has no authority to insure property already destroyed. . . . " (See, also, *Bentley* v. *Columbia Ins. Co.*, 17 N. Y. 421; 28 Cent. Dig. 703; 11 Dec. Dig. [Ins.] 127.) The principle laid down in these authorities is equally applicable to compensation insurance.

Whether or not the insurer, under all the circumstances, could have issued a policy which covered the loss—either total or partial—the authorities we have cited sustain the proposition that, unless there is a subsisting contract of insurance when the loss occurs, a general agent, in the absence of express authority, has no power to issue a policy. We think it has been made clear that in this case there was no contract in force at the time of the injury. One was written on the day following the loss, but was never "issued" until it was delivered to Smith on October 9th. Before that time the date of the application had been changed from September 25th to October 3d and the policy from October 3d to September 25th.

The following authorities are cited in the brief filed by the respondent commission in support of the proposition that a general agent has authority to issue a policy covering a known loss and binding on his principal: *New York Ins. Co.* v. *Russell*, 77 Fed. 103, [23 C. C. A. 43]; *Insurance Co.* v. *Colt*, 87 U. S. (20 Wall.) 560, 567, [22 L. Ed. 423]; *Eames* v. *Home Ins. Co.*, 94 U. S. 621, [24 L. Ed. 298; see, also, Rose's U. S. Notes]; *Schultz* v. *Phoenix Ins. Co.*, 77 Fed. 374, 392; *Kennebec* v. *Augusta Ins. Co.*, 6 Gray (Mass.), 204; *Warner* v. *Peoria etc. Ins. Co.*, 14 Wis. 345; *Komula* v. *General Assur. Co.*, 165 Wis. 520, [162 N. W. 919]. These authorities are distinguishable from the case here in that in each of them, *prior to the loss,* the insured had signified his acceptance of the terms offered by the insurance company and thus a contract of insurance had been concluded. No authority has been cited, and we are aware of none, holding that a general agent, unless specially authorized,

may issue a policy for a known loss where the terms of the contract of insurance had not already been settled upon.

[7] The general rule is that whenever the parties have entered into a contract before the loss occurs or the policy has been issued, unless the authority of the general agent is expressly delimited, the policy, when issued, by operation of law relates back to the application and is dated accordingly—the policy being thereafter merely evidence of the contract; but this general rule has no application where the parties were not under contract at the time of the injury, and the general agent is without special authority to issue a policy to cover the loss.

Since it appears, then, that no contract of insurance was concluded prior to the accident, that Smith had no authority to bind petitioner by a parol contract of insurance, that the "custom and the practice" found by the commission to have been followed did not extend to a case where, at the time of the loss, the parties had not agreed upon the terms of the contract, and that the general agent was, in such circumstances, without authority to issue a policy, it follows that the findings cannot be sustained.

The award is annulled.

Shaw, J., Olney, J., Lennon, J., and Angellotti. C. J., concurred.

WILBUR, J., Dissenting.—I dissent. The evidence shows that the workmen's compensation law did not apply to Dr. Pond until, at the solicitation of the agent Smith, he elected to be bound by its terms. The effect of his election was to charge him with responsibility for the injury to his employees under the terms of that law, even if he was wholly without fault, as in this case. Because of such election Dr. Pond evidently intended to keep covered by insurance. Accordingly he notified Smith, petitioner's agent, that he desired an indemnity policy, dating from the expiration of his existing insurance, and that he was willing to pay whatever premium was charged by the company. The petitioner offered its insurance policies for sale to the public generally at a fixed and uniform rate. The terms and provisions of the policy being thus fixed, the question of insurance turned upon the willingness of the prospective

policy-holder to pay the premium demanded therefor by the company. At the time Dr. Pond applied to Smith for the policy he stated that he·was willing to pay the premium, whatever it might be. Instead of communicating this fact to the general agent, Smith inserted in the written application the amount of the premium as $10. This resulted in the complications detailed in the main opinion. The evidence discloses that the company was willing to write the policy and that Pond was willing to pay the amount of the insurance, and this willingness had been communicated by the one to the other. The whole difficulty arose from the failure of Smith to state in the written application for insurance the fact that Dr. Pond was willing to pay the increased premium. This was not the fault of Dr. Pond. The policy applied for was one dated September 25, 1917, and the policy finally issued and paid for was so dated. Wilson, to all intents and purposes, was the general agent of the company. He conducted the entire business of the general agent, in the name of the general agent, without consultation with him. Upon the insistence of Smith that Dr. Pond was entitled to a policy dated September 25, 1917, in accordance with the custom of the office he issued such a policy so dated, after knowledge of the accident, which policy covered the liability here sought to be enforced. In view of the delay caused by the failure of its agent Smith to communicate to the general agent the facts, namely, the willingness of Dr. Pond to pay the premium asked, which would have resulted in the prompt issuance of the policy, it would seem that common honesty demanded of the defendant that it accept the responsibility due to the delay of its own agent in communicating a correct statement of the actual terms of the application. The finding of the ultimate fact by the commission was that the written policy which by its terms covered the accident was binding by reason of a previous oral negotiation between the parties. I think the evidence is sufficient to justify this finding. Under somewhat similar facts, in Eames v. Home Ins. Co., 94 U. S. 621, [24 L. Ed. 298, see, also, Rose's U. S. Notes], it was held under the circumstances there stated that the acceptance of the rate by the insured in a communication to the local agent was sufficient to bind the company where the rate had been previously fixed by the general agent, and that although

no policy was ever issued, the insurance company was bound. The only difference in the two cases in principle is that in the case at bar the information that the applicant was willing to pay the premium demanded was communicated to the local agent before the premium was fixed by the general agent, and in *Eames* v. *Home Ins. Co.* it was communicated afterward. In neither case did the information that the applicant, was willing to pay the premium demanded reach the general agent in time for the issuance of the policy before the loss, while in *Eames* v. *Home Ins. Co.* the policy was never issued, and in the case at bar it was issued with full knowledge of the fact. I think that Dr. Pond had signified his acceptance of the terms offered by the insurance company and thus a contract of insurance had been concluded.