### DRAKE v. MISSOURI STATE LIFE INS. CO.

Circuit Court of Appeals, Eighth Circuit. July 28, 1927.

No. 7731.

Insurance ☞130(1)—Application for life insurance and acceptance under misunderstanding of kind of policy desired held not to have constituted contract.

Where an application for life insurance which was ambiguous as to the kind of policy desired, was accepted by the company, and it prepared to issue and tender to applicant a policy in accordance with its understanding of the application, but applicant understood it to call for a policy on a different plan, and before tender could be made applicant died, there was no meeting of minds and no contract resulted.

In Error to the District Court of the United States for the Eastern District of Oklahoma; Robert L. Williams, Judge.

Action at law by Bernice Drake against the Missouri State Life Insurance Company. Judgment for defendant, and plaintiff brings error. Affirmed.

Melton & Melton and Reford Bond, all of Chickasha, Okl., for plaintiff in error.

Frank Wells, of Oklahoma City, Okl. (D. I. Johnston, of Oklahoma City, Okl., and Morton Jourdan, F. L. English, and Allen May, all of St. Louis, Mo., on the brief), for defendant in error.

Before KENYON, Circuit Judge, and MOLYNEAUX and JOHN B. SANBORN, District Judges.

JOHN B. SANBORN, District Judge. Bernice Drake is the widow of J. F. Drake, deceased. On August 8, 1923, he signed an application for life insurance in the defendant company for $50,000 "on the term N. P. S. C. plan, A, B, C, or D. ——— rate." "N. P. S. C." meant nonprofit sharing convertible. Mr. H. J. Brown, one of the company's agents in Oklahoma, took the application, and forwarded it to the company. Mr. Drake told Mr. Brown that he wanted the cheapest policy the company wrote. This was the nonparticipating, convertible 5-year term policy, plan "A." The plan was not stated in the application as made out by Mr. Brown, and was not discussed. Mr. Brown calculated the premium to be $516.50, and Mr. Drake paid him that amount, and the application so showed. The premium should have been $515.50. The application was forwarded to the home office of the company in St. Louis, Mo., and reached the office August 13, 1923. It was returned to the company's general agents in Oklahoma to have stated the length of term, which had been omitted in the application, and the full name of the beneficiary. It should be stated that, at the same time that Mr. Drake made application for this policy, he also made application for a similar policy for $100,000, the beneficiary in which was to be his partner. Because of the amount of the insurance called for, a second medical examination was required by the company, was made on August 20th, and the report received August 22d. Some further physical tests were re-

quired, which were completed, so far as the home office was concerned, on October 17th. The rating sheet of the company, which gives the history of the application, contains this notation under date of October 19th: "150,-000 reinsure above Co. limit. P. L. G. A. R. S. 10/20/23 J. J. P." This referred to the two applications, the one for $50,000 involved in this suit, and the other for $100,-000 not here involved. The initials were those of two assistant medical directors and a fourth vice president, who had authority to pass on applications. The total amount of insurance called for being more than the company's limit, it intended to retain $20,-000, and reinsure the balance. The application then went to the policy division of the company for issuance of the policy and for arrangement for reinsurance. This was about October 20th. The policy of insurance which carried a premium nearest $516.-50 was the 5-year term nonprofit sharing "A" plan, the premium on which, as stated, was $515.50, and which was the policy that both Mr. Drake and Mr. Brown had in mind at the time the application was made out. The company construed the application as calling for insurance on the "C" plan, taking the letter "C" before the word "plan" in the application to refer to that kind of a contract. But the company was not permitted to write $50,000 of insurance on the "C" plan, and at first intended to treat the application as calling for part of the insurance on the "C" plan and the balance on the "D" plan. Finally it was determined to issue a policy on the "B" plan, calling for a premium of $518. Under the "A" plan, the insured pays premiums regardless of disability. Under the "B" plan, if permanently disabled, premiums are waived. This accounts for the slight difference in the amount of premium. Mr. Drake died the night of October 22d. At that time, most, but not all, of the reinsurance had been arranged for. The reinsurance was being arranged on the basis of the policy being issued on the "B" plan. On the 24th of October, a notation on the rating sheet shows that the company authorized a class "C" $10,000 term policy.

The application contains this provision: "My acceptance of any policy issued on this application will constitute a ratification by me of any correction in or additions to this application made by the company in the space provided for 'home office indorsements' only,' the policy issued pursuant to such change to be governed by provision No. 16 (c) of this application." In the space pro-vided "For home office indorsements only," on the face of the application, appears these words: "Statement No. 2–16 corrected to read as follows: 2. On the 5 yr. term. Conv. non-par plan class 'B.' 16. Ann. Prem. should be $518.00." Statement No. 2 is the statement of the kind of insurance applied for, and statement No. 16 is the amount of premium.

16 (c) of the application provides: "That if the first premium for the insurance hereby applied for be not paid to the agent at the time of making this application or if only a part of such premium be paid as aforesaid, or if the policy be issued for a less amount or on any other plan than that for which this application is made, the insurance shall not be effective until the policy is delivered to and accepted by me and the first premium thereon actually paid during my lifetime and continued good health, but upon such delivery, acceptance and payment during my lifetime and continued good health the policy shall be deemed to have taken effect from and shall bear the date of approval of the home office, or other date specifically requested by the applicant, on which date in each year thereafter subsequent premiums will be due and payable."

16 (a) of the application provided: "That if the first premium for the insurance hereby applied for be paid to the agent at the time of making this application in exchange for the company's advance premium receipt therefor, corresponding in date and number with this application and signed by the company's agent, the policy, if and when subsequently issued by the company in accordance with the terms of and for the amount and on the plan applied for in this application and delivered to me or my legal representative, shall, unless otherwise specifically requested, be dated and be effective in accordance with the provisions of such policy on and from the date of the medical examination."

16 (b) of the application provided: "That if the company shall not issue the policy for the amount and on the plan applied for, the amount paid as premium shall be returned on surrender of this receipt."

The advance premium receipt reads:

"Received of Joseph F. Drake the sum of five hundred sixteen and 50/100 dollars as the first annual premium on a policy of insurance for $50,000.00 on his life, for which application has been made this day to the Missouri State Life Insurance Company, such premium being paid in accordance with the conditions of Agreements (a) and (b)

contained in the said application, copy of which agreements are printed on the back and made a part hereof.

"Walters, Oklahoma, Aug. 8, 1923.

"[Signed] H. J. Brown, Agent."

On the back of the receipt was printed clauses (a), (b), and (c) referred to above. The evidence showed that the company could have issued an "A" plan policy, and afterwards have adjusted the reinsurance. A Mr. Newton, in charge of the policy division, determined that a "B" plan policy should be issued upon this application. The policy was written up on October 24, 1923, on the "B" plan. On that day the company received news of Mr. Drake's death, and nothing more was done, except to make this note on the rating sheet: "10/24/23. Reconsidered and declined"—and to tender back the premium, which was refused. No notice was given to the assured that the application had been accepted, and the rating sheet was merely a record of the company for its own use. Except for Mr. Drake's death, the "B" plan policy would have been sent to the agency accounting department of the company, and from there have gone to the general agents in Oklahoma City, with a statement and letter of transmittal, and would have been delivered to Mr. Drake.

Mrs. Drake, who was named as the beneficiary in the application, brought suit in the state court of Oklahoma against the company, on the theory that the application of her husband had been accepted and that a contract of insurance was in existence. The company removed the case to the United States District Court, where it was tried and a verdict directed for the defendant, and judgment entered thereon. It was brought here for review on a writ of error.

The single question involved is whether there was in effect at the time of the death of Mr. Drake a contract of insurance between him and the defendant growing out of his application. The plaintiff claims that the company accepted unconditionally the application, and that therefore there was a contract, and that the actual issuance and delivery of the policy would have added nothing. There is grave doubt whether a contract of insurance could have become effective until actual delivery to Mr. Drake—assuming unconditional acceptance of the application—but we think it is unnecessary to discuss or decide that question.

It is elementary, of course, that there can be no contract unless the minds of the contracting parties meet. Mutual L. Insurance Co. v. Young's Administrator, 23 Wall. 85,

23 L. Ed. 152; Mohrstadt v. Mutual Life Ins. (C. C. A.) 115 F. 81; Piedmont & A. Life Ins. Co. v. Ewing, 92 U. S. 377, 23 L. Ed. 610; La Compania Bilbaina v. Spanish Am., etc., Co., 146 U. S. 483, 13 S. Ct. 143, 36 L. Ed. 1054; MacKelvie v. Mutual Ben. Life Ins. Co. (C. C. A.) 287 F. 660; Travis v. Nederland Life Ins. Co. (C. C. A.) 104 F. 486.

The application of Mr. Drake was ambiguous. It did not specify the plan upon which the policy was to be written, nor could the company tell from the amount of premium collected by the agent what form of contract was called for. Mr. Drake had in mind a policy upon the "A" plan, which called for a premium of $515.50. The company construed the application as calling for insurance on the "C" plan, or part upon the "C" and part upon the "D." Finally, it was determined to issue and tender to Mr. Drake a "B" plan policy, calling for a premium of $518. The fact that the company would have issued an "A" plan policy, if it had known what Mr. Drake wanted, has no bearing on the case. It is what was done, and not what might have been done, or what would have been done, which is controlling, and we can make no contract for the parties. Mutual L. Insurance Co. v. Young's Adm'r, supra.

The thing which is fatal to the claim of the plaintiff is that the consent of the company to be bound by the contract which Mr. Drake proposed to make is entirely absent. The approval of the application did not amount to a consent, because those approving it had one thing in mind, while Mr. Drake had another. The fact is that Mr. Drake was entitled to refuse the policy the company was preparing to tender him, and recover his premium, and the company could not have successfully defended against a suit to recover it. It had not earned one dollar of the premium paid by Mr. Drake at the time of his death. It cannot be said that Drake was insured prior to his death upon the "A" plan, because the evidence shows that the company never had in mind that his application was for that kind of insurance, nor was he insured on the "B" plan, because he had made no offer to become so insured. The knowledge of the agent cannot help matters, because the acceptance of the application was, by its terms, for the company at its home office, and it did not accept the application for the policy Mr. Drake intended and agreed to pay for.

In St. Paul Fire & Marine Ins. Co. v. Ruddy, 299 F. 189, 193, this court said: "As to the general legal phases applicable to the

situation, it may be observed that there is no contract unless the minds of the parties meet; that an insurance contract is no different than any other contract in that respect; that the contract is a personal one between the insurer and the insured; that, if there is no obligation as to one of the parties, there is none as to the other; that, if anything of importance remained to be done by either party, the contract would not be complete. Stephenson v. Germania Fire Ins. Co., 100 Neb. 456, 160 N. W. 962, L. R. A. 1917B [D] 307; Lett v. Guardian Fire Ins. Co., 125 N. Y. 82, 25 N. E. 1088; Davis v. Bremer County Fire Ins. Ass'n, 154 Iowa, 326, 134 N. W. 860; [Mutual L.] Insurance Co. v. Young's Administrator, 90 U. S. (23 Wall.) 85, 106, 23 L. Ed. 152; New England Loan & Trust Co. v. Kenneally, 38 Neb. 895, 57 N. W. 759; Atlas Reduction Co. et al. v. New Zealand Ins. Co. of New Zealand, 138 F. 497, 71 C. C. A. 21, 9 L. R. A. (N. S.) 433; Phœnix Life Ins. Co. v. Raddin, 120 U. S. 183, 7 S. Ct. 500, 30 L. Ed. 644."

Quoting from another decision of this court in Ætna Indemnity Co. v. J. R. Crowe Coal & Mining Co., 154 F. 545, 556: "It is well settled that an application for insurance is a proposition to the insurance company which must be accepted as made, if at all. If a policy is executed and offered to the applicant different in any material respects from the application, it is in effect a rejection of the application, and a new proposition by the company, which the applicant may accept or reject at his pleasure" (citing cases).

Again, in Rushing v. Manhattan Life Ins. Co. (C. C. A.) 224 F. 74, 78, it was said: "The material modification of the terms of a proposal of a contract by the party to whom it is offered is a rejection of the proposal and the tender of a new offer, which cannot become a contract until it has become known to and has been accepted by the first proposer." See, also, McNicol v. New York Life Ins. Co. (C. C. A.) 149 F. 141.

It is contended, however, that the question as to whether the company accepted Drake's application for an "A" plan policy was, under the facts shown, a question for the jury. The evidence of the company that the application was construed to be on the "C" plan is uncontradicted. The reinsurance was procured by the company on the "B" plan; the application bears the notation of the company of a correction of the application to call for a "B" plan policy, and the policy was actually written upon the "B" plan; and all these things were done prior to any notification of Drake's death. We are unable to see how a verdict of a jury, in effect finding that the company understood the application to call for a policy of insurance on the "A" plan and had accepted it upon that basis, could stand in the face of this testimony.

The case of Van Arsdale-Osborne Brokerage Co. v. Cooper, 28 Okl. 598, 115 P. 779, relied on by the plaintiff, is beside the point. It is authority for the proposition that it is not essential to the validity of a contract of insurance actually agreed upon that a policy be executed unless that is a condition of the contract. It does not apply to this case, because there was here no contract of insurance actually agreed upon.

The judgment is affirmed.