## NATIONAL QUICKSILVER CORPORATION v. WORLD INS. CO. OF OMAHA, NEB.

### No. 12518.

Circuit Court of Appeals, Eighth Circuit.

Dec. 20, 1943.

Rehearing Denied Jan. 12, 1944.

Alfred Featherston, of Murfreesboro, Ark., and G. C. Hardin, of Fort Smith, Ark. (J. Clib Barton and Bruce H. Shaw, both of Fort Smith, Ark., on the brief), for appellant.

Malcolm W. Gannaway, of Little Rock, Ark. (Jack W. Marer, of Omaha, Neb., on the brief), for appellee.

Before SANBORN, WOODROUGH, and RIDDICK, Circuit Judges.

SANBORN, Circuit Judge.

This is an action upon an "Employer's Security Accident Policy" issued by the appellee under date of February 13, 1942, in which Ira Cox, the mine foreman of the appellant, was the insured and the appellant was the beneficiary. Cox died on February 27, 1942, from accidental injuries received in the course of his employment the day before. If the policy in suit, which had been applied for before his death but which had not at that time been written or delivered, was in force on February 26, 1942, the appellant was entitled to $5,000. The appellee denied that the insurance was in force. The action was brought in the Circuit Court of Pike County, Arkansas. The appellee removed it to the court below. The bond on removal was defective in an essential particular. The appellant moved for a remand of the case to the State court on the ground that the bond was fatally defective and was not subject to amendment after the time within which the case could be removed had expired. The motion to remand was denied, and the appellee was permitted to amend the bond. Issues were joined and the case was tried

to a jury. There was no substantial dispute as to the material facts. At the close of the evidence, each side moved for a directed verdict. The court, being of the opinion that the policy in suit was not in force on February 26, 1942, directed a verdict in favor of the defendant (appellee), and the plaintiff (appellant) has appealed from the judgment entered upon the verdict.

The appellant contends (1) that the bond on removal was void and that the case should therefore have been remanded to the State court; and (2) that, under the undisputed facts, the appellant was entitled to judgment.

▇▇ We think that the giving of a defective bond on removal does not defeat jurisdiction, and that the defect is subject to correction. See and compare Ayers v. Watson, 113 U.S. 594, 597, 598, 5 S.Ct. 641, 28 L.Ed. 1093; Kinney v. Columbia Savings & Loan Ass'n, 191 U.S. 78, 82, 24 S.Ct. 30, 48 L.Ed. 103; Hodge v. Chicago & A. R. Co., 8 Cir., 121 F. 48; Beede v. Cheeney, C.C.Minn., 5 F. 388; Johnson v. F. C. Austin Mfg. Co., C.C.Kan., 76 F. 616; Chase v. Erhardt, D.C., 198 F. 305; Gray v. Oregon Short Line R. Co., D.C., 37 F.2d 591, 593; C. I. T. Corp. v. Ambrose, D.C., 36 F.Supp. 311. Even in the absence of amendment, we have no doubt that if suit were brought to recover upon a defective removal bond, the court would treat it as what it was intended to be, a proper statutory bond on removal. The denial of the appellant's motion to remand was not error.

The appellant operates a cinnabar mine in Pike County, Arkansas, is an employer of labor, and is subject to the Workmen's Compensation Act of Arkansas. Acts 1939, Act 319. The appellee is an insurance company, the Home Office of which is in Omaha, Nebraska. In 1942 it was writing in Arkansas "Employer's Security Accident Policies", which were intended to afford protection to employers against claims of their employees under the Workmen's Compensation Act resulting from accidental occupational injuries. In these policies the employee was named as the insured, and the employer as the beneficiary. The policies provided for an accidental death benefit of $5,000. In January, 1942, the appellant's Board of Directors authorized the procurement of such insurance on the appellant's employees from the appellee through W. A. Stackable, one of the appellee's agents who was also a small stockholder of the appellant and its acting secretary. On February 7, 1942, the appellant had six of its employees sign separate applications for policies. One of these applicants was Ira Cox, the appellant's mine foreman. The appellant arranged with Stackable to take stock for the amount of the premiums to be paid on the policies.

On February 10, 1942, the applications were sent by Stackable to S. V. Abraham, manager of the appellee's Arkansas office in Little Rock, Arkansas, with a letter reading as follows:

"Dear Sam:

"Here are the apps on employees we talked about today.

"Check for the quarterly nets is attached. Lets see you get them issued and in the mails back to me before Saturday—air mail, please! Issue them complete!

"I'll have about 6 more as soon as the foreman can contact the men."

Abraham forwarded the applications to the Home Office of the appellee, where they were received on February 13. Abraham wrote Stackable on February 13, as follows: "This will acknowledge receipt of your applications together with your check in the amount of $22.74. However, you must have miscalculated the premiums, for the premiums should have been $28.42. I know that you failed to charge the additional first premium." On February 18, Abraham again wrote Stackable relative to the employees (including Ira Cox) who on February 7 had applied for insurance, as follows: "We have applications from above employees of the National Quicksilver Corporation and observe that their occupations are shown as Mining. Please inform us the type of mine in which they work and if they are underground miners, the premium will have to be rated up 20 per cent over the one quoted." In this letter Abraham also asked for additional information relative to Curtis Chambers, one of the applicants. Again, on February 25, Abraham wrote Stackable asking him to attend to his (Abraham's) letter of February 18, which he quoted in full. On February 25, Stackable wrote to Abraham as follows:

"This is in reply to your letter about the risks submitted as indicated on top of your letter of Feb. 18, 1942.

"I return the bottom of your letter concerning applicant Curtis Chambers, indi-

cating the facts with reference to his health history.

"Do I understand that the applications are still in your office? I have also your letter of February 13 in which you state that I did not send you enough money, apparently neglecting to include the additional 'first premium' in my basis for figuring the net. You are right about that, and of course, I will have to remit the difference which I am sending with this letter, in amount of $5.68 which is the difference between the $22.74 and the $28.42 you referred to.

"As to these men's occupations, I rated them the highest that was showed on the application list of prices. They are listed as miners, but they are not coal miners, and they do not all work underground. In fact, they are 'hard rock' miners in the cinnabar mine area in Pike County, Arkansas. They never have any gas to contend with, and they never have a fall of rock hurt a man. They have a watchman who never goes underground, and they have a hoist-man who operates a small engine and never goes underground, and other also never go underground. Other men do ride down in the 'bucket' in shaft about 65 feet and work with air jack-hammers and put small charges of dynamite in drill holes, and then come out to 'shoot' the charges, returning to shovel the cinnabar ore into the 'bucket' so it may be hoisted out. If this means that they are all to be rated as underground miners and charged 20% extra, that will have to be O. K., so go ahead with the rating, and charge my account. The main thing is to get the coverage, because I supposed we would have the policies back before now on some kind of basis.

"Call the watchman a top man, the foreman both a top and shaft man, William Whiteman and Joe Chambers top men, and the others, A. M. Jones and C. Chambers shaft men, and we'll change later if we find it is not correct. Or call all of them underground, if the company rules require it when all work around such a mine."

On February 26, Ira Cox, one of the applicants for insurance, was accidentally burned while in the course of his employment. He died of his injuries the following day. Stiles, the president of the appellant, was immediately informed of the death of Cox, and he advised Stackable. On February 28, Stackable wrote Abraham and sent in an application for insurance on another of the appellant's employees, but did not mention the death of Cox.

On March 4, the appellee, which did not know of the death of Cox, forwarded to Abraham the six policies—including the policy covering Cox—the applications for which had been received by the appellee at its Home Office on February 13. The letter of transmittal stated:

"In connection with above [names of six applicants], we have issued policies and rated them up 20 per cent on account of their occupations. Regardless of how many times they go underground, the same rate would apply.

\* \* \* \* \* \*

"\* \* \* We have changed the first premium on the Ira Cox policy from $15.15 to $17.80."

On March 6, Abraham sent the six policies to Stackable for delivery to the appellant, with a letter containing the language quoted above from the appellee's letter of transmittal. On the same day, Stackable wrote Abraham a letter enclosing another application for insurance upon an employee of the appellant, and again made no mention of the death of Cox. In this letter Stackable stated: "Finally, you had up with me the matter of charging these cinnabar miners an extra 20% if they worked underground. When you and I talked about it, you said the highest rate on the blue blanks was the one that should be charged to miners, and I sold the employer on that basis. But the employer is wanting the protection and the Home Office should know what cinnabar mining is, as compared with other kinds of mining, such as gold, lead, zinc, coal, etc., etc. This employer is not setting the price; he is buying the insurance, and he wants it issued now, not next month; if he don't like the price, he will be privileged to drop the benefits, so please step on it and get the insurance issued on some basis. I told this firm that any discrepancy in the price would be charged to me and I would collect any balance from them, and that was O. K."

On March 7, Stackable wrote Abraham stating that he (Stackable) had collected the additional premiums, including "Ira Cox $2.65".

Upon receiving the policies, Stackable delivered them to Stiles, the president of the appellant. Stiles on March 9 wrote Abraham notifying him of the death of

Cox and asking for the form necessary to make a claim. This was followed by a denial of liability by the appellee and a tender by it of the premium paid for the Cox policy.

The six policies (including the Cox policy) delivered to the appellant were dated February 13, 1942, the date when the applications were received by the appellee at its Home Office. The policies were similar in all substantial particulars, as were also the applications. There was no provision in the Cox policy, nor in the application for it, that the insurance should not become effective unless the policy was delivered during the lifetime of the insured. There was no agreement that the delivery of the policy and the payment of the first premium in full were conditions precedent to liability.

At the trial, Stiles, the president of the appellant, testified that Stackable advised him about March 1 that the premium on the Cox policy was increased 20% because Cox worked underground part of the time, and that on or about that date he (Stiles) gave Stackable the money for the extra premium; that he did not know whether Stackable had paid for the six policies himself, as the appellant had received Stackable's claim for premiums and paid him in stock of the company.

Stackable testified that Abraham had instructed him to solicit policies like the Cox policy from cinnabar miners; that he (Stackable) had procured four applications for such policies from another concern, and the policies had been issued; that he found from his experience that it was the "policy" of the appellee to accept these mining risks if the questions in the applications were properly answered, as they were in the Cox application; that Stackable's instructions were to get the business and the appellee was ready to accept it; that he understood that the closing of the business was a matter of getting the applications; that he had notified Stiles before Cox died that the applications had been properly received and that the "business was closed"; that he (Stackable) contracted for the appellee with reference to conditions as they existed on the date of the application; that he delivered the Cox policy to Stiles because neither the policy nor the application required that the policy be delivered while the insured was in good health; that he (Stackable) had a "run-ning account" with the appellee; that Abraham would accept business from him whether the premium had been paid or not, charging him with the "nets"; that when Abraham wrote him on February 25, he (Stackable) had already written Abraham giving him the coverage requested and advising him to get the coverage; that he (Stackable) thought that Cox was covered at the time of his death; that the required additional premium was sent by Stackable to the appellee on March 7.

Anna Cameron, secretary to Abraham, testified that she countersigned the Ira Cox policy at Little Rock on March 6, the day she received it and the other five policies from the Home Office; that the office in Little Rock does not issue policies; that she saw the applications for these policies as they came through the Little Rock office, and that the upper half of the Cox application contained the following notations: "Home Office Record. Policy No. 175466. Dated issued 2/13/42."

Abraham testified that the Little Rock office does not issue policies; that the policy on Ira Cox was of a class which the appellee writes on miners; that Stackable is still an agent for the company in good standing, and his business is being accepted by the company.

Ruth Kuran, assistant secretary and chief underwriter of the appellee at its Home Office, testified, in substance, that her duties were to classify and appraise risks and fix the rates of premium from the statements contained in applications; that applications come to her office; that she received the application of Ira Cox; that her department wrote the Cox policy on March 4, 1942; that she had sufficient information on March 2 to enable her to classify the risk and to know whether she wanted to issue the policy; that the application was on that day "O. K.'d for issue"; that the information which enabled her to issue the policy was that contained in the letter of February 25 from Stackable to Abraham showing that some of the applicants went underground; that this letter was received at the Home Office on March 2. Miss Kuran further testified that the underwriting department of the appellee, and not the Little Rock office, had the right to bind the appellee on insurance contracts; that when applications were received they carried the date of receipt and the policies carried that date; that the Cox

policy was dated the day the application was received; that she made final decisions as to the issuance of policies; that, except for determining the duties of Cox's occupation in order to fix the rate of premium, his application, as received on February 13, contained all the information necessary for the issuance of his policy; that no other investigation was made; that the application was accepted, and Abraham was notified thereof and inquiry was made of him about the hazards involved; that the Home Office was at all times willing to assume the underground risk, subject to the proper rate for the risk; that the premium charged was the usual premium for such a risk to cover the period from February 12, 1942, to June 1, 1942; that the pencil notation at the top of the application showing the date issued as "2/13/42" was made in the underwriting department and is the date automatically recorded for the application "to go in on preliminary work" before the final approval for issue; that the appellee was in the business of writing insurance for miners based on the classifications of the rate book used by accident insurance companies, and that it was necessary to know something about the applicant and his duties. Miss Kuran also testified that the reason for dating the policy the day the application was received was that the appellee was contracting with reference to the correctness of the answers contained in the application and the conditions existing at the time it was received.

It is apparent that if the appellee had not by February 26, 1942, insured Cox against accidental death, it did not insure him thereafter or assume liability for his death. What happened after the death of Cox is of no consequence except for such light as it may shed upon the existence or non-existence of a completed contract of insurance prior to the accident which caused his death.

The evidence shows that the appellee on February 13, 1942, had received the application for the insurance; that the appellee knew the type of policy that was called for; that the application was in proper form and was accepted subject to the ascertainment of the correct rate of premium to be charged and paid; that Stackable was conducting the negotiations for the insurance on behalf of the appellant and the insured, and that Stackable had on February 25, 1942, written to Abraham that the additional premium required by the appellee would be paid.

It is elementary that there is no contract unless the minds of the parties have met. Drake v. Missouri State Life Ins. Co., 8 Cir., 21 F.2d 39, 41, and cases cited. This Court said in St. Paul Fire & Marine Ins. Co. v. Ruddy, 8 Cir., 299 F. 189, 193: "As to the general legal phases applicable to the situation, it may be observed that there is no contract unless the minds of the parties meet; that an insurance contract is no different than any other contract in that respect; that the contract is a personal one between the insurer and the insured; that, if there is no obligation as to one of the parties, there is none as to the other; that, if anything of importance remained to be done by either party, the contract would not be complete." See, also, Drake v. Missouri State Life Ins. Co., 8 Cir., supra, 21 F.2d 39, 41, 42, and cases cited.

Were it not for Stackable's letter to Abraham of February 25, 1942, we would be of the opinion that the minds of the parties had not met, and that no contract of insurance existed on February 26, 1942. The application of Cox as tendered by Stackable was not accepted by the appellee, because it was unwilling to write the insurance at the rate specified by Stackable. The appellant would not have been obliged to accept the insurance at a higher premium. The appellee's letter of February 18 to Stackable, stating that the rate would have to be increased 20% if the applicant was an underground miner, amounted to an offer by the appellee to write this insurance at the higher rate. Drake v. Missouri State Life Ins. Co., supra, 21 F.2d at page 42; Ætna Indemnity Co. v. J. R. Crowe Coal & Mining Co., 8 Cir., 154 F. 545, 556; Rushing v. Manhattan Life Ins. Co., 8 Cir., 224 F. 74, 78. When that offer was transmitted to Stackable and was accepted by him on behalf of the appellant and the insured on February 25, the minds of the parties had met and the contract was complete.

The facts in this case are substantially similar to those in Eames v. Home Insurance Co., 94 U.S. 621, 625, 24 L.Ed. 298. There the insurer, by letter, evidenced its willingness to accept an application for fire insurance, but at a rate higher than that which the applicant had offered to pay. Three days before the property to be in-

sured was destroyed by fire, the applicant wrote the agent of the insurer: "Six and a half per cent is pretty heavy, but I guess we will have to stand it, as I do not know where we can do better at present." The Supreme Court ruled that this letter was an acceptance of the insurer's counter offer, that a contract of insurance was then complete, and that the insurer was liable, although the terms of the agreement had not been reduced to written form prior to the loss.

The Eames case was followed in Cottingham v. National Mutual Church Ins. Co., 290 Ill. 26, 124 N.E. 822, where the facts are also analogous to those in the instant case. The correspondence between the parties was held to have resulted in a contract for fire insurance, although at the time of loss no policy had been issued and the rate of premium had not been definitely determined nor paid. The letter which the court held to be an acceptance of the offer of the insurer, had been mailed prior to, but was not received by the insured until after, the loss. See, also, and compare, Riordan v. Equitable Life Assur. Soc., 31 Idaho 657, 175 P. 586; Globe & Rutgers Fire Ins. Co. v. Draper, 9 Cir., 66 F.2d 985, 988; Born v. Home Ins. Co., 120 Iowa 299, 94 N.W. 849; Carter v. Bankers' Life Ins. Co., 83 Neb. 810, 120 N.W. 455; McMaster v. New York Life Ins. Co., 8 Cir., 99 F. 856, 866–867; Western Indemnity Co. v. Industrial Accident Commission, 182 Cal. 709, 190 P. 27.

In 29 Am.Jur., Insurance, § 136, p. 152, it is said: "While the usual course of dealing is otherwise, negotiations for an insurance contract may be initiated by the insurer offering to insure on certain terms, and where this is the case the contract is complete on the acceptance of the offer by the person proposed to be insured. If the offer is made by mail and no different time for acceptance is specified in the offer, the contract is consummated and becomes binding on the mailing of the letter of acceptance, properly stamped, within a reasonable time after the offer is received." See, also, Vol. 1, Cooley's Briefs on Insurance, 2nd Ed., pp. 609, 610. Professor Vance, in Vance on Insurance, 2nd Ed., p. 198, with respect to "Insurance by Correspondence", says:

"The rules governing acceptance by letter in general contract law apply fully to similar conditions in the law of insurance. The contract is consummated by acceptance upon the mailing of the letter of acceptance properly stamped and addressed, and the insurer will be bound, even though the letter may never be received, or may be received only after the property insured has been destroyed. But in an early Massachusetts case it was held that the insurer was not bound until the receipt of the letter containing the acceptance of the insured. This, however, is clearly contrary to the great weight of authority.

"It is immaterial what may be the form which the communications that are alleged to evidence the contract of insurance may assume, or how informal they may be. It is sufficient if these communications clearly show that the parties have come to an agreement upon the essential terms of the contract. Thus, in the leading case of Eames v. Home Ins. Co., [94 U.S. 621, 24 L.Ed. 298], a letter in which the plaintiff wrote, '6½% is pretty heavy, but I guess we will have to stand it, as I do not know where we can do better at present,' was held to be a sufficient acceptance of the offer made by the defendant in a letter to which the one quoted from was the reply."

Our conclusion is that, under the facts of this case, there was a valid and enforceable contract of insurance in existence on February 26, 1942, and that the appellant was entitled to a directed verdict.

The judgment appealed from is reversed and the case is remanded with directions to enter a judgment for the appellant, including the statutory penalty and attorneys' fees (to be fixed by the District Court) required by the laws of Arkansas.