**INTERNATIONAL UNION OF OPER-
ATING ENGINEERS, LOCAL UNION
NO. 547 v. PFEIFFER BREWING CO.**

**No. 10709.**

United States District Court,
E. D. Michigan.

Oct. 20, 1953.

Marcus, Kelman, Loria, McCroskey &
Finucan, Detroit, Mich., for plaintiff.

William Henry Gallagher and Robert
J. Kelly, Detroit, Mich., for defendant.

PICARD, District Judge.

Plaintiff, a labor organization, brings
suit on behalf of two of defendant's em-
ployees and predicates its action on the
theory that defendant employer violated
their contract. Defendant contends that
suit on contract is merely a ruse to give
jurisdiction to the federal court and
thus usurp the duties and powers of the
N.L.R.B.

If defendant is correct, then plaintiff
agrees that this court has no jurisdic-
tion, but we hold to the contrary and
adopt plaintiff's claim that in this ac-
tion it is suing on a purported contract
and alleging breach thereof.

We must, therefore, determine if
there is a contract between the parties
covering the questions involved and, if
so, whether such contract has been
broken.

### The Facts.

In the brewery industry of Michigan,
each brewery has the right to make its
own contracts with the several local
unions. Usually, Local 547 A. F. of L.
bargains for operating engineers, while
Local 32 A. F. of L. bargains for fire-
men, boiler room maintenance men,
boiler operators and oilers. On occa-
sions, however, 547 has represented boil-
er operators and 32 has bargained for
operating engineers.

The evidence also indicates that there
is one group of brewery workers who
might be considered as betwixt and be-
tween the jurisdictions of Locals 547
and 32. These are the so-called "ap-
prentice engineers" who are at times
seemingly in a no-man's-land as to clas-
sification. Some. breweries recognize
"apprentice engineers" as such; others
do not. But whenever a brewery does
recognize 547 as the bargaining agent
for this class of men the contract has
always specifically set forth that fact
in the appropriate paragraph along with

the other classifications bargained for, such as "operating engineers", and reciting the agreed rate of pay.

The facts further show that defendant company never admitted that any of its employees were within the "apprentice engineers'" classification, at least up to the time of the contract and controversy in question, although in 1936 there was a contract signed between 547 and eight Detroit breweries, including defendant, specifically recognizing the classification as such. Admittedly, therefore, there has been a struggle at defendant's plant for years between 547, to obtain such recognition, and 32, to prevent the alleged raiding of its ranks.

It is undisputed that Local 547 was at the times pertinent hereto recognized as the exclusive bargaining representative for all defendant's employees classified as operating engineers and that Local 32 had been recognized by defendant as exclusive bargaining representative of all defendant's employees classified as boiler operators and oilers. It is also undisputed that defendant's engineering department consists of an engine room and boiler room adjacent to each other and connected (or separated) by a large archway; that during most of the time defendant had in its employ four operating engineers subject to the supervision of the chief engineer; and that there were four boiler operators who were required to maintain a constant watch over the boilers in the boiler room.

In 1935, defendant hired one Lewis Green, in addition to the eight men already employed in the boiler and engine rooms, but in a new capacity, to wit, to assist the engineers in checking the refrigerator system and do defrosting and oiling in the engine room. In 1944, he was transferred to the boiler room.

In 1946, one Ray Hoefline was transferred from the boiler room to the engine room where he began taking temperatures in the cellars, oiling the machinery and in general assisting the operating engineer—the same type of work Green was doing. Hoefline was at all times classified as a boiler operator and paid boiler operator wages until he finally quit defendant's employ in 1952.

Albert Rates, one of the real parties in interest here, was hired as a boiler operator on June 16, 1947. That fall he was transferred from the boiler room to the engine room where he did essentially the same work as Hoefline on a different shift. On May 6, 1948 Rates was sent back to his station in the boiler room and at the same time Green was transferred back to the engine room where he is employed today in a capacity which could be classified as that of an "apprentice engineer". But Green has always been a member of Local 32 and designated as boiler operator. Then on June 11, 1949 Rates was reassigned to the engine room and a new man was hired to replace him in the boiler room. In this connection, it is well to note that when Rates was first hired by defendant he joined Local 32, but in October, 1948, when he was still in the boiler room, he also joined Local 547. Local 32 raised no objection because Rates kept paying his dues to Local 32 until January, 1949, when he stopped, retaining only his membership in Local 547. This step, however, precipitated strenuous objections from 32 and finally, in accordance with its contract with Local 32, defendant was obliged to discharge Rates on May 7, 1951. During the entire term of his employment with defendant, Rates was classified by defendant as a boiler operator and paid boiler operator wages.

William Balconi, the other real party plaintiff, was hired in May, 1947, as a boiler operator to work in the boiler room and on June 11, 1949 was assigned to the engine room. Up to January, 1949, he paid dues to Local 32 and from October 8, 1948 he also paid dues to Local 547. In 1950 he was warned by defendant of its contract with Local 32 and in 1950 he resumed payment of dues to Local 32 and continued to do so until June 6, 1952, when he became a first rate operating engineer.

It is also interesting to note that when plaintiff presented defendant with its annual contract in the years 1946 and 1947, it had the following classifications listed:

Chief Engineer

Operating Engineer

Apprentice Engineer

but before defendant would sign either contract the words "Apprentice Engineer" were stricken on a typewriter in this manner:

~~Apprentice Engineer~~

In July, 1948, defendant promised to negotiate with plaintiff in regard to apprentice engineers at some future date, but November of the same year found plaintiff still "seeking" such a meeting. Finally, on January 17, 1949, some negotiation evidently took place because a letter sent by plaintiff to defendant confirmed the agreement supposedly reached at that meeting, stating:

"that Mr. Balconi will be placed in the engine room to work as an apprentice as of this date."

and

"that if your employees, Mr. Green and Mr. Hoefline make application for membership in our union, Local No. 547, on or about May 31st, 1949, we are pledged to accept them as members which would guarantee their employment as apprentices, in your power plant, subject to your approval after May 31st, 1949."

At this point, plaintiff was in its best position to assert a contract (although the words "subject to your approval" might be argued to the contrary,) had not its position later been considerably weakened by the happening of two events

(a) another meeting held immediately following the January 17th meeting

and

(b) the parties later, on two occasions, actually signed contracts that were the consummation of all previous conversations and agreements.

At the meeting following the January 17th conference, held January 18th or 19th, defendant and the two Locals, 32 and 547, discussed the status of Hoefline and Green, members of Local 32, employed in the engine room, and Rates and Balconi, then working in the boiler room. Following that meeting, Richard A. Forsythe, Labor Relations Counsel for the Detroit Breweries, wrote a letter, dated January 20, 1949, to Alfred Epstein, president of defendant, as confirming the following settlement by the parties:

"(1) Green and Hoefline to continue in the Engine room;

"(2) Balconi and Reitz (Rates) continue in the Boiler Room until May 31, 1949. (That was usually the time when the new contract was negotiated for the coming year;)"

and

"(3) On June 1, 1949, all four men will be given the opportunity to work as apprentice engineers, their duties to be defined in the new contract to be negotiated with Mr. Crow (the bargaining agent for 547) on or about that date." (Parenthetical insertions ours.)

Here again plaintiff approaches the nucleus of an agreement but when May 31, 1949 arrived and the new contract between Local 547 and defendant was actually signed, it simply provided that

"The Employer shall recognize and bargain with the Union as the exclusive representative and sole bargaining agent for all employees in the classifications indicated in Section (b) of Article II of this agreement."

Article II, Section (b) provided that

"The minimum rate of wages to be paid by The Employer to the Union men shall be as follows: Operating Engineer ............. $2.21 per hour."

There is no mention made of "apprentice engineers" in this all important section and the only reference to ap-

prentice engineers is in Article II(h) where it is provided that:

> "*In the event* the *Employer* presently employs, or during the life of this contract *employs, Apprentice Engineers,* the rate of pay for such employees will be agreed to in writing between the Employer and the Union, it being understood that the rate paid any such employees in the employ of the Employer on May 31, 1949, will be increased by 10¢ per hour, effective June 1, 1949." (Emphasis ours.)

While plaintiff insists that this should be interpreted as meaning that anybody doing "apprentice engineer" work was covered, the evidence shows that all parties, Locals 547, 32, and defendant, were hoping that the A. F. of L.'s national convention to be held in September, would iron out these jurisdictional difficulties, which, unfortunately, it did not. Moreover, the fact is that at the very time the May 31, 1949, agreement was signed, Hoefline and Green, members of Local 32, were in defendant's engine room doing what plaintiff claims is apprentice engineer's work and later Rates and Balconi joined them there. But defendant still classified all of these men as boiler operators and paid them boiler operator wages with no remedial action on the part of plaintiff.

Finally, the death knell to plaintiff's hopes to have all these letters, meetings, conclusions, etc., interpreted as a contract, sounded on August 23, 1950 when, again, Local 547 and defendant executed a new three year contract at which time all four men were still in the engine room doing what might easily be classified as "apprentice engineer" work. Nevertheless, that new agreement provided only that

> "*In the event* the *Employer* presently employs or during the life of this contract *employs Apprentice Engineers,* the rate of pay for such employees will be agreed to in writing between the Employer and the Union." Article II(h) (Emphasis ours).

No such agreement was ever entered into, indicating that the defendant company never considered those four men as "apprentice engineers" or admitted they were.

The words, "In the event" in both the 1949 and 1950 contracts are all-important, particularly since thereafter the said four men continued to be classified as boiler operators and were paid boiler operator wages.

The question was presented in one phase to the N.L.R.B. on February 27, 1951 when defendant sought a determination of who was the proper representative of these men, but the N.L.R.B. extricated itself in the following language:

> "* * * the contracts between the company and the Operating Engineers and between the company and the Firemen and Oilers, are a bar to further proceedings. Furthermore no question of representation exists on the facts."

Based on the theory that these men were doing "apprentice engineers'" work, plaintiff claims pay differentials for Rates from June 1, 1949 to May 17, 1951 when he was fired; and for Balconi, from June 1, 1949 to June 6, 1952, when he became an operating engineer. The period from February 20, 1950 to May 31, 1950 has been deducted from its claim, inasmuch as defendant, on a purely voluntary basis, raised their hourly rate of wages during this period while they were going to a technical training school.

### Conclusions of Law.

Regardless of what may otherwise be urged, the controversy here is really a jurisdictional dispute between Locals 547 and 32 and this court can find no evidence that a "contract" covering Rates and Balconi was ever actually consummated between 547 and defendant. True, there is the letter of January 20, 1949 regarding apprentice engineers and recognizing 547 as bargaining agent for any one in defendant's plant employed as such, beginning June

1, 1949, but this only presented the basis for an agreement which was never made. What plaintiff evidently did was to indulge in sufficient gestures to pacify its own conscience or perhaps its members. It bored in but never directly forced the issue, undoubtedly because it was aware that defendant was obliged to discharge either Rates or Balconi at 32's request if either of them failed to pay his 32 dues.

■ Assuming, however, that plaintiff was under the impression that the letter of January 20, 1949, gave it an understanding with defendant to the effect that 547 was the representative of "apprentice engineers" and that anybody doing such work would be paid the appropriate rate of pay; still that is not the way the contract reads. It specifically provides that the chief engineer and operating engineers are the only classifications of employees for which 547 is the bargaining agent, and that in the event any apprentice engineers are presently or in the future employed, a further agreement will be made. Moreover, the preliminary negotiations for a contract may not be substitutes for the formal contract itself. Mid-Continent Petroleum Corp. v. Russell, 10 Cir., 173 F.2d 620, 17 C.J.S., Contracts, § 49, page 390. Local 547 could possibly sooth its own group by directing attention to the fact that defendant had agreed that "apprentice engineers" would be paid apprentice engineer's pay, but it never succeeded in inserting a clause *in any of the contracts to the effect that the defendant must classify those who were doing that work as apprentice engineers*. To this very day no contract covering these men, Rates and Balconi, as apprentice engineers, has been negotiated and each successive agreement promised somewhat vaguely that this will only be done *in the event* that defendant should employ any "apprentice engineers". Local 547 again and again bargained for the pay the apprentice engineers were to receive when certain facts should come to pass in the future, although it well knew that those facts were presently existing and had been for some time. So we are obliged to inquire whether 547 was trying to pacify its members and/or secure covertly, step by step, what it had not had the power or courage to secure outright. Such procedures or endeavors to save face with one's constituents are not sufficient grounds for a court to find that a contract exists.

We suggest that no citation of authority is necessary for the proposition that if plaintiff never entered into a proposed contract with defendant, he cannot hold the defendant to that contract.

■ In every contract there must be a meeting of the minds. National Quicksilver. Corp. v. World Ins. Co., 8 Cir., 139 F.2d 1; Mid-Continent Petroleum Corp. v. Russell, supra.

In addition to the foregoing reasons, it is obvious that defendant did not agree that Rates and Balconi were "apprentice engineers" since two others, Hoefline and Green, were not considered as such although they were doing the same work. Plaintiff could have persisted, had it so desired and felt certain of its position, that the proper provisions be placed in the contracts in the same manner as other groups are covered, leaving no points for misunderstanding, but it never did so.

■■ The court will not make a contract for the parties nor permit itself to be drawn into purely jurisdictional differences. Rambusch Decorating Co. v. Brotherhood of Painters, Decorators and Paperhangers of America, 2 Cir., 105 F.2d 134; Shell Oil Co. v. Manley Oil Corp., 7 Cir., 124 F.2d 714; Transcontinental & Western Air v. Parker, 8 Cir., 144 F.2d 735.

We therefore hold for defendant.